UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

ANTHONY M. GRANT,

      Plaintiff,

    v.

NANCY A. BERRYHILL,

      Defendant.

Case No. 17-cv-03423-LB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: ECF Nos. 18, 19

## INTRODUCTION

    Plaintiff Anthony Grant seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for disability benefits under Title II and Title XVI of the Social Security Act.[1] He moved for summary judgment.[2] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[3] Under Civil Local Rule 16-5, the matter is submitted for decision without oral argument. All parties consented to magistrate-judge

---

[1] Mot. – ECF No. 18 at 4. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 1.

[3] Cross-Mot. – ECF No. 19.

jurisdiction.[4] The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings.

## STATEMENT

### 1. Procedural History

On November 15, 2012, Mr. Grant, born on August 31, 1970 and then age 42, filed a claim for social-security disability insurance ("SSDI") benefits under Title II of the Social Security Act.[5] On December 28, 2012 he filed a claim for supplemental security income ("SSI") benefits under Title XVI.[6] He alleged congestive heart failure, sleep apnea, cellulitis with acute edema, high blood pressure, swelling in both legs, shortness of breath, and chest pain.[7] On reconsideration, Mr. Grant alleged that he was suffering from depression, his legs were "constantly swollen," and he had greater difficulty breathing.[8] He alleged an onset date of July 30, 2010.[9] The Commissioner denied his SSDI and SSI claims initially and on reconsideration.[10] Mr. Grant timely requested a hearing.[11]

On July 20, 2015, Administrative Law Judge Richard P. Laverdure (the "ALJ") held a hearing in Oakland, California.[12] Attorney Reed Wickham represented Mr. Grant.[13] The ALJ heard testimony from Mr. Grant, vocational expert ("VE") Timothy Farrell and medical expert ("ME") James Todd, M.D.[14] On August 25, 2015, the ALJ issued an unfavorable decision.[15] Mr. Grant

---

[4] Consent Forms – ECF Nos. 7, 9.

[5] Administrative Record ("AR") 228.

[6] AR 236.

[7] AR 93–94, 135–36, 278.

[8] AR 136.

[9] Id.

[10] AR 105, 133 (determinations on SSDI claim); AR 118 and 147 (determinations on SSI claim).

[11] AR 171.

[12] AR 48.

[13] Id.

[14] Id., AR 32 (Dr. Todd testified by telephone).

[15] AR 29.

timely appealed the decision to the Appeals Council on September 15, 2015.[16] The Appeals Council denied Mr. Grant's request for review on April 10, 2017.[17] On June 13, 2017, Mr. Grant timely filed this action for judicial review[18] and subsequently moved for summary judgment on April 6, 2018.[19] The Commissioner opposed the motion and filed a cross-motion for summary judgment on May 4, 2018.[20] Mr. Grant filed a reply on May 18, 2018.[21]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 Alta Bates Summit Medical Center Physicians — Treating

Mr. Grant was treated on multiple occasions at the Alta Bates Summit Medical Center from January 2009 through August 2015.[22] The records reflect his morbid obesity: for example as of August 23, 2015, he was 5' 8" tall and weighed 405 pounds.[23] Mr. Grant often was admitted for shortness of breath or difficulty breathing,[24] chest pain,[25] leg pain,[26] and leg swelling.[27] During the course of these visits, emergency room physicians[28] and specialists[29] saw Mr. Grant and diagnosed

---

[16] AR 27–28.

[17] AR 1–7.

[18] Compl. – ECF No. 1 at 1–2.

[19] Mot. – ECF No. 18.

[20] Cross-Mot. – ECF No. 19.

[21] Reply – ECF No. 20.

[22] AR 599–746, 803–71, 1042–65, 1604–1781.

[23] AR 1729.

[24] *See, e.g.,* AR 628, 700, 758, 1045, 1773.

[25] *See, e.g.,* AR 1045, 1733.

[26] *See, e.g.,* AR 1607, 1624.

[27] *See, e.g.,* AR 1045, 1607, 1613, 1624, 1740.

[28] Mr. Grant saw numerous emergency room physicians, including Dennis Bouvier, D.O., Rebeka Barth, M.D., Reina Rodriguez, M.D., Benjamin Lerman, M.D., Justin Paul Lee, M.D., Christopher Michael Kolly, D.O., Melissa Tang, M.D., and Keala Landry, M.D. *See* AR 758, 1045–52, 1605, 1613, 1624, 1627, 1694, 1733, 1772.

him with numerous chronic health problems, including morbid obesity,[30] restrictive lung disease due to morbid obesity,[31] polysubstance abuse,[32] hypertension,[33] sleep apnea,[34] edema,[35] kidney disease or kidney injury,[36] dyspnea,[37] cellulitis or sepsis secondary to cellulitis,[38] diastolic dysfunction,[39] respiratory failure,[40] congestive heart failure,[41] lymphadenopathy,[42] depression,[43] chronic pain,[44] and noncompliance or suspected noncompliance with his medications or dietary regimen.[45]

Discharge summaries and consultation notes from two recent, fairly long admission periods at Alta Bates Summit Medical Center illustrate some of the complications that Mr. Grant experienced due to his chronic medical conditions. The first extended hospital stay was from

---

[29] Mr. Grant saw numerous specialists, including Henry Tan, M.D., an intensive-care unit physician, James McFeely, M.D., a pulmonologist, Ole Dierks, M.D., a nephrologist, James Perlada, M.D., an infectious disease specialist, and Collin Mbanugo, M.D., a surgeon. *See* AR 729, 769, 1607.

[30] *See, e.g.*, AR 628, 752, 769, 1049, 1607, 1685, 1773.

[31] *See, e.g.*, AR 769.

[32] *See, e.g.*, AR 628, 1539, 1773.

[33] *See, e.g.*, AR 628, 769, 786, 1049, 1607, 1627, 1685, 1699, 1773.

[34] *See, e.g.*, AR 628, 769, 1049, 1685, 1724, 1773.

[35] *See, e.g.*, AR 729, 769, 783, 786, 807, 1737.

[36] *See, e.g.*, AR 628, 769, 1607, 1627, 1685, 1724, 1740, 1773.

[37] *See, e.g.*, AR 767, 780, 786, 1685. "Dyspnea refers to the sensation of difficult or uncomfortable breathing." *Neal v. Colvin*, No. 1:14-cv-01503-SKO, 2015 WL 5232328, at *1 n.3 (E.D. Cal. Sept. 8, 2015) (citing *Dorland's Illustrated Medical Dictionary* 589, 1359 (31st ed. 2007)).

[38] *See, e.g.*, AR 1607, 1627, 1724, 1731, 1773.

[39] *See, e.g.*, AR 1694, 1724, 1740, 1773. "'Diastolic dysfunction' refers to an abnormality in how the heart fills with blood during the first part of the two parts of a heartbeat." *Smith v. Colvin*, No. 1:14-cv-03139-AJB, 2016 WL 1211952, at *8 n.13 (N.D. Ga. Mar. 28, 2016) (quoting Texas Heart Institute, Diastolic Dysfunction, http://www.texasheart.org/HIC/Topics/Cond/ddisfunc.cfm).

[40] *See, e.g.*, AR 730, 769.

[41] *See, e.g.*, AR 786, 1694, 1773.

[42] *See, e.g.*, AR 1607, 1773. Lymphadenopathy is characterized as "enlarged lymph nodes." *Hamm v. Comm'r, Alabama Dep't of Corr.*, 725 F. App'x 836, 837 (11th Cir. 2018).

[43] *See, e.g.*, AR 1627.

[44] *See, e.g.*, 1627, 1773.

[45] *See, e.g.*, AR 628, 766–67, 769, 1049.

November 19, 2014 through December 7, 2014.[46] He weighed 364 pounds during this stay.[47] Rachel Kalpna Munzni, M.D., noted that Mr. Grant came to the hospital for left leg swelling and pain.[48] Mr. Grant's discharge diagnoses were sepsis (resolved), left leg cellulitis with DVT (deep-vein thrombosis) ruled out, hypertension, acute kidney injury on chronic kidney disease, lymphadenopathy, and morbid obesity.[49] Mr. Grant underwent testing for deep-vein thrombosis, including a Doppler ultrasound and a CT scan, and the test results were negative.[50]

David Perlada, M.D., an infectious-disease specialist, examined Mr. Grant's "worsening cellulitis" on his left leg.[51] Dr. Perlada's impression was that Mr. Grant was suffering from "severe lymphedema"[52] in his left leg "with superimposed cellulitis and probably a reactive lymphadenopathy on [his] left groin."[53] Dr. Perlada prescribed numerous antibiotics, recommended that an interventional radiology specialist aspirate the big lymph node in Mr. Grant's left groin, and deferred to a nephrologist concerning Mr. Grant's "aggressive diuresis."[54]

Collin Mbanugo, M.D., provided a surgical consultation.[55] Dr. Mbanugo noted that Mr. Grant's left leg was swollen to twice the size of his right leg and that he did not see "any drainable abscess."[56] Dr. Mbanugo concluded that "there [was] nothing that require[d] any surgical

---

[46] AR 1605.

[47] AR 1615.

[48] AR 1607.

[49] *Id.*

[50] *Id.*

[51] AR 1638.

[52] AR 1641. "Lymphedema is a 'swelling that generally occurs in one of your arms or legs.'" *Hooper v. Astrue*, No. 7:11-CV-244-D, 2012 WL 6645006, at *2 (E.D.N.C. Dec. 20, 2012) (quoting *Lymphedema*, Mayo Clinic, http://www.mayoclinic.com/health/lymphedema/DS00609).

[53] AR 1641.

[54] *Id.*

[55] AR 1642.

[56] *Id.*

drainage" and recommended that Mr. Grant take an aggressive regimen of antibiotics and elevate his left leg.[57]

Ole Dierks, M.D., a nephrologist, also saw Grant during this admission period.[58] Dr. Dierks assessed that Mr. Grant had an acute kidney injury on chronic kidney disease, left-lower-extremity cellulitis, severe hypertension, obesity, lymphadenopathy, edema, OSA (obstructive sleep apnea), hypertensive heart disease, leukocytosis,[59] and anemia.[60] Dr. Dierk's plan was that Mr. Grant should stop taking Lasix and start taking antibiotics.[61]

The second hospital stay was from March 16, 2015 through April 16, 2015.[62] Leif R. Hass, M.D., noted in Mr. Grant's discharge summary that Mr. Grant was admitted "for treatment of CHF [congestive heart failure] exacerbation."[63] He weighed 384 pounds at the end of this hospital stay.[64] Christopher Kolly, D.O., an emergency-room physician, noted that Mr. Grant "arrived diaphoretic, clammy, [and] in significant respiratory distress."[65] Mr. Grant was "only able to verbalize one word sentences."[66] Mr. Grant's discharge diagnoses were acute diastolic-congestive heart failure "due to noncompliance and etoh (alcohol) use," significant dyspnea and chronic edema, acute kidney injury, obstructive sleep apnea, morbid obesity, chronic pain, polysubstance abuse, debility, and anxiety due to recent trauma, namely, the death of a friend two weeks before Mr. Grant's admission to Alta Bates Summit Medical Center.[67] Dr. Hass instructed Mr. Grant to

---

[57] *Id.*

[58] AR 1628.

[59] "Leukocytosis is an increase in the number of white blood cells in the blood." *Boyle v. Colvin*, No. 1:14-cv-1294, 2015 WL 350383, at *4 n.3 (N.D. Ohio Jan. 23, 2015) (quoting *Leukocytosis*, Dictionary.com, http://dictionary.reference.com/browse/leukocytosis).

[60] AR 1628.

[61] *Id.*

[62] AR 1685. The record is not entirely clear in that there are two discharge dates listed. The other discharge date is March 19, 2015.

[63] *Id.*

[64] AR 1687.

[65] AR 1698.

[66] *Id.*

[67] AR 1685.

follow up with his primary-care physician within five days, and he noted that Mr. Grant would receive outpatient care at home.[68]

### 2.1.2    Eastmont Wellness Center Physicians — Treating

From February 11, 2011 to December 22, 2011, Mr. Grant received treatment at the Eastmont Medical Center.[69] The medical evidence from Eastmont Wellness Center contains several handwritten progress notes, many of which are difficult to read. The record indicates, however, that physicians treated Mr. Grant for diastolic dysfunction, cellulitis, hypertension, congestive heart failure, edema, and obstructive sleep apnea.[70] The doctors on these visits would adjust Mr. Grant's medications to treat his symptoms. For example, on August 25, 2011, the doctor prescribed "flurosemide, metoprolol, enalapril"[71] and recommended "venous stasis stockings to use in morning."[72]

### 2.1.3    San Leandro Hospital Physicians — Treating

Mr. Grant was admitted to San Leandro Hospital on two occasions. His first admission period was from March 2 to March 7, 2011 for cellulitis, edema, redness, and pain in his right leg.[73] Mr. Grant also had a "significant leukocytosis of 21,000."[74] Zarlasht Fakiri, D.O., wrote Mr. Grant's discharge summary.[75] Mr. Grant's discharge diagnoses were right-lower-extremity cellulitis with acute edema (improved), chronic lower-right-extremity edema (likely secondary to venous insufficiency), acute clinical congestive heart failure (improved with Lasix and likely systolic), morbid obesity, hypertension (improved), borderline diabetes mellitus (aggravated by Mr. Grant's

---

[68] *Id.*

[69] AR 575.

[70] *See e.g.,* AR 582–84.

[71] AR 582–83.

[72] AR 583.

[73] AR 414, 416.

[74] AR 416.

[75] *See* AR 415–18.

obesity), hyponatremia[76] (improved with fluid restriction), hypokalemia[77] (secondary to Lasix), a history of obstructive sleep apnea, pneumonia, normocytic anemia,[78] and hypoalbuminemia.[79] Dr. Fakiri noted that Mr. Grant initially had a fever, but his temperature decreased and leukocytosis improved after starting antibiotics.[80] During the course of Mr. Grant's stay, Mr. Grant was eventually able to walk using a walker, his dyspnea improved, and his antibiotic regimen was "tapered."[81] Dr. Fakiri noted that he had spoken with Mr. Grant "at length on several occasions with his mother present" concerning weight loss, nutrition, and an exercise regimen.[82] Joseph C. Cheng, M.D., an orthopedic surgeon, consulted and found that Mr. Grant could continue to wear "hardware" on his right ankle that he had typically worn due to an earlier ankle fracture because the hardware was not infected and because of Mr. Grant's weight.[83]

The second admission period at San Leandro Hospital was from June 26 to June 28, 2013.[84] Madhumati Rampure, M.D., wrote in Mr. Grant's discharge summary that Mr. Grant was hospitalized for shortness of breath with acute respiratory failure.[85] Mr. Grant's admitting diagnosis was acute respiratory failure (improved with no evidence of infection), mild congestive

---

[76] "Hyponatremia is 'a condition that occurs when the level of sodium in your blood is abnormally low.'" *Marshall v. Astrue*, No. 4:10-CV-1978, 2011 WL 5862625, at *8 n.28 (M.D. Pa. Nov. 22, 2011) (quoting Hyponatremia, Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/hyponatremia/DS00974).

[77] "'Hypokalemia' is the name for abnormally low potassium concentration in the blood which may result from excessive potassium loss by the renal or gastrointestinal route, from decreased intake, or from transcellular shifts." *Collins v. Astrue*, 493 F. Supp. 2d 858, 871 n.24 (S.D. Tex. Apr. 16, 2007) (quoting *Dorland's Illustrated Medical Dictionary* 513 (29th ed. 2000).

[78] "Normochomic normocytic anemia is 'a reduction below normal concentrations of red blood cells in which the hemoglobin content and red blood cell size are still normal.'" *Buford v. Comm'r of Soc. Sec.*, No. 12-cv-5751 (KAM), 2015 WL 8042210, at *4 n.10 (E.D.N.Y. Dec. 3, 2015) (citations omitted).

[79] AR 415–16. Hypoalbuminemia is characterized as "low levels of albumin in the blood." *Houston v. Colvin*, Civil Action No. 1:12-CV-2148, 2014 WL 901095, at *7 n.24 (M.D. Pa. Mar. 7, 2014).

[80] AR 416.

[81] AR 417.

[82] *Id.*

[83] AR 416.

[84] AR 1013–16, *see also id.* at 1486–1516.

[85] AR 1013.

heart failure (improved with Lasix), morbid obesity, a history of hypertension, a history of sleep

apnea, "[p]robably compensated respiratory acidosis,"[86] chronic kidney disease (currently stable),

normocytic anemia (with no evidence of an active bleed), chronic bilateral lower extremity

swelling (right lower extremity more swollen than the left lower extremity), and a history of

polysubstance abuse.[87] Dr. Rampure noted that because Mr. Grant "initially was very lethargic and

sleepy," T. Craig Williams, M.D., had concluded that Mr. Grant's CPAP machine was most likely

leaking.[88] Mr. Grant also underwent a CT scan to rule out a stroke, and the results were negative.[89]

Mr. Grant was placed on a BiPAP (bilevel positive airway pressure) machine, and his condition

improved.[90] He was transferred out of the intensive-care unit and prescribed antibiotics and

steroids, which were later discontinued.[91]

### 2.1.4    Frank Chen, M.D. — Examining

On July 30, 2011, Dr. Chen performed an internal-medicine evaluation of Mr. Grant, who then

weighed 340 pounds.[92] He diagnosed Mr. Grant with hypertension (advising him to seek medical

attention), shortness of breath (likely due to obesity), chronic edema of both lower legs (greater in

the right due to venous stasis and prior history of cellulitis of the right lower leg), and morbid

obesity.[93] Dr. Chen made the following functional-capacity assessment:

> The number of hours that claimant could stand and walk in an 8-hour workday is
> about 4–6 hours. He may sit for 6 hours in an 8-hour work day. No assistive device
> is medically necessary. The amount of weight that claimant could lift or carry is 50

---

[86] "Respiratory acidosis, also called respiratory failure or ventilator failure, is a condition that occurs when lungs can't remove enough of the carbon dioxide ($CO2$) produced by the body . . . Respiratory acidosis is typically caused by an underlying disease or health condition . . . such as asthma, COPD, pneumonia, or sleep apnea." *Jackson v. Berryhill*, No. 3:13-00692, 2017 WL 4937612, at *6 n.6 (M.D. Tenn. Aug. 14, 2017) (quoting Healthline, *Respiratory Acidosis*, http://www.healthline.com/health/respiratory-acidosis#Overview1).

[87] AR 1013.

[88] AR 1014.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] AR 563–65.

[93] AR 565.

pounds occasionally and 25 pounds frequently. There are no postural limitations on bending, stooping or crouching and the claimant can perform this frequently. There are no manipulative limitations on reaching, handling, feeling, grasping or fingering, and the claimant can perform this frequently. There are no workplace environmental limitations.[94]

A corrective action letter was issued September 2, 2011, questioning "[the] quality of [Dr. Chen's] CE [(consultative examination)] reports, [and] thoroughness of examinations."[95] Subsequently, Dr. Chen was removed from the Disability Determination Services ("DDS") "panel for his unprofessional manner and failure to adequately correct deficiencies in his CE reports."[96] (The ALJ assigned no weight to his opinion.[97])

### 2.1.5    Louis Giorgi, M.D. — Non-Examining

Dr. Giorgi filled out a physical-residual functional-capacity assessment on August 25, 2011 and concluded the following about Mr. Grant: (1) exertional limitations: occasionally lift 20 pound; frequently lift 10 pounds; stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday; sit (with normal breaks for 6 hours in an 8-hour workday; and unlimited push and/or pull (including operation of hand and/or foot controls); explained the evidence in support of these assessments as "gait normal" and "bilat. lower extremities: pitting edema;" (2) postural limitation: occasionally climb ramps/stairs/ladders/rope/scaffolds, crouch, and crawl; frequently balance, stoop, and kneel; (3) manipulative limitations: none; (3) communicative limitations: none; and (4) postural limitations: none.[98] Dr. Giorgi further noted that Mr. Grant suffered from hypertension and had been advised to seek medical attention.[99]

---

[94] *Id.*

[95] AR 40 n. 1. (ALJ quoting first "Corrective Action" letter).

[96] AR 40 n. 1 (quoting third and final "Corrective Action" letter); *see also Hart v. Colvin*, No.15-cv-00623 (JST), 2016 WL 6611002, at *7 (N.D. Cal. Nov. 9, 2016) (approving a class-action settlement that included provisions for re-opening certain disability cases where the claimant was examined by Dr. Chen, but providing that "if Dr. Chen's CE report was explicitly afforded no weight in the analysis, that individual [would] not be eligible for another review of his or her claim.").

[97] AR 40 n. 1.

[98] AR 567–571.

[99] *Id.*

### 2.1.6   Jodi Snyder, Psy.D. — Examining

On June 25, 2013, Dr. Snyder, a psychologist, examined Mr. Grant.[100] She reviewed his medical history, considered his chief complaint (obstructive sleep apnea, hypertension, and shortness of breath), identified his substance-abuse history (denied present use, self-described alcoholic with seven DUI's and his last drink the day before), reviewed his employment history (past construction and in-home care with last job four years ago).[101] She administered a battery of tests: a complete psychological exam, the Folstein Mini Mental Status Exam, the Wechsler Adult Intelligence Scale, the Weschler Memory Scale, and Trails A & B.[102] For the Mental Status Exam: she noted his cooperative and friendly attitude, his fair eye contact, his falling asleep and poor attention, his poor insight and judgment, and his depressed mood, among other things.[103] His intelligence test had borderline results for verbal comprehension, perceptual reasoning, and working memory, and extremely low results for processing speed and FSIQ.[104] His Auditory Memory Index Score was extremely low, and his Visual Working Memory Index was low average.[105] Her summary reflected the following additional points, among others: (1) cognitive functioning: score suggested difficulties with cognition (but "considering he fell asleep, please interpret with caution"); (2) emotional functioning: client reported depression due to worsening medical issues; and (3) prognosis/discussion: "Guarded: Diffuse difficulty with cognition noted to all domains. However, considering he fell asleep several times during the testing, please interpret with caution. Claimant's issues appear primarily medical in nature with secondary depression. Will defer to medical opinion to address medical issues."[106]

---

[100] AR 798–802

[101] AR 798–99.

[102] AR 800.

[103] *Id.*

[104] *Id.* "FSIQ" is an abbreviation for "full-scale IQ." *See Nicholson v. Colvin*, 106 F. Supp. 3d 1190, 1195 (D. Or. 2015).

[105] AR 801.

[106] *Id.*

Her diagnosis was as follows: (1) Axis I: depressive disorder, not otherwise specified (NOS), and cognitive disorder, NOS; (2) Axis II: deferred; (3) Axis III: hypertension; shortness of breath, chronic edema of both legs (right greater than left); morbid obesity; and obstructive sleep apnea; (4) Axis IV: chronic health concerns; economic problems; limited support system; occupational problems; and (5) Axis V: a global assessment of functioning (GAF) score of 61.[107]

In her medical-source statement, she reported the following level of impairments for work-related activities: (1) unimpaired: ability to follow simple instructions and ability to maintain adequate pace or persistence to perform one or two simple repetitive tasks; (2) mildly impaired: ability to maintain adequate attention/concentration; ability to adapt to changes in job routine; ability to interact appropriately with co-workers, supervisors, and the public on a regular basis; and ability to adapt to changes, hazards, or stressors in a workplace setting; (3) mild-moderate impaired: ability to follow complex/detailed instructions; ability to maintain adequate pace or persistence to perform complex tasks; ability to adapt to changes in job routine; and ability to withstand the ability of a routine workday; and (4) no ability to manage funds.[108]

### 2.1.7    Preston Davis, Psy.D. — Non-Examining

On July 28, 2013, Dr. Davis, a psychologist, reviewed Mr. Grant's medical records through July 9, 2013.[109] The records note Mr. Grant's height and weight of 5'8" and 375 pounds.[110] Dr. Davis identified the following impairments, alleged and discovered: CHF (congestive heart failure), sleep apnea, acute edema, HTN (hypertension), bilateral leg swelling, SOB (shortness of

---

[107] AR 801–02. A Global Assessment of Functioning ("GAF") score purports to rate a subject's mental state and symptoms; the higher the rating, the better the subject's coping and functioning skills. "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *See Worsham v. Colvin*, No. 15CV55-WQH-MDD, 2016 WL 750108, at *3 n.1 (S.D. Cal. Jan. 12, 2016) (report and recommendation), *adopted*, No. 15CV55-WQH-MDD, 2016 WL 739792 (S.D. Cal. Feb. 25, 2016). "According to the DSM–IV, a GAF score between 61 and 70 describes "mild symptoms . . . but generally functioning pretty well . . . . [sic] DSM–IV–TR, p.34." *Id.*

[108] AR 802.

[109] AR 93–100.

[110] AR 93.

breath), chest pain, and discovered DAA (drug and alcohol abuse) issues.[111] After reviewing Mr. Grant's medical history, Dr. Davis identified the following medically determinable impairments: essential hypertension (primary, severe), obesity (secondary, severe), organic mental disorders (other, non severe), and affective disorders (other, non severe).[112] He found mild restrictions for activities of daily living, difficulties maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.[113] There was "insufficient evidence" to evaluate if Mr. Grant experienced "Repeated Episodes of Decompensation."[114] He concluded that Mr. Grant did not meet the "A," "B" or "C" criteria for Listings 12.02 or 12.04.[115]

### 2.1.8    Nick Mansour, M.D. — Non-Examining

On July 22, 2013, Dr. Mansour reviewed Mr. Grant's records and made a residual-functional capacity ("RFC") assessment.[116] Mr. Grant's exertional limitations based on his morbid obesity are as follows: occasionally lift and/or carry (including upward pulling) 25 pounds; frequently lift and/or carry (include upward pulling) 10 pounds; stand/walk (with normal breaks) for a total of four hours; sit (with normal breaks) for about six hours in an eight-hour workday; and unlimited push and/or pull (including operation of hand and/or foot controls).[117] Mr. Grant's postural limitations were as follows: frequently climb ramps/stairs; occasionally climb ladders/ropes/scaffolds; frequently balancing; frequently stooping; frequently kneeling; occasionally crouching; and occasionally crawling.[118] Dr. Mansour offered the following additional explanation:

> This man's main problem is his morbid obesity. He has actually diastolic dysfunction which is called diastolic CHF. I find no evidence of frank pulmonary

---

[111] AR 97.

[112] AR 99.

[113] AR 100.

[114] *Id.*

[115] *Id.*

[116] AR 101–03.

[117] AR 102.

[118] *Id.*

edema or CHF and it appears that part of the problem may be excessive alcoholic intake and lack of compliance with his hypertension medications.[119]

He opined that Mr. Grant could not do his past relevant work as a home attendant or a security guard because he was limited to sedentary work.[120] He gave "great weight" to Dr. Frank Chen, because it was "[consistent with] findings,"[121] and less weight to Dr. Snyder's analysis because the opinion was "not fully supported by other evidence from other evidence of record."[122]

### 2.1.9    J.R. Saphir, M.D. — Non-Examining

On January 20, 2014, Dr. Saphir made an RFC assessment.[123] He repeated Dr. Mansour's conclusions, also discounting Dr. Snyder and assigning "great weight" to Dr. Chen.[124]

### 2.1.10    Patrice Solomon, Ph. D. — Non-Examining

On January 21, 2014, Dr. Solomon reviewed Mr. Grant's medical records through January 1, 2014.[125] She reported the following medical impairment/diagnoses: essential hypertension (primary, severe); obesity (secondary, severe); organic mental disorder (other, non-severe); affective disorder (other, non-severe); and substance-abuse disorders (other, non-severe).[126] Dr. Solomon also reviewed Mr. Grant's psychological records and concluded that Mr. Grant did not suffer from severe mental limitations.[127] Concerning the "paragraph B" criteria for Listings 12.02 and 12.04, Dr. Snyder found that Mr. Grant had only mild limitations.[128] She concluded that the

---

[119] AR 103.

[120] AR 104.

[121] AR 101.

[122] AR 103.

[123] AR 130–31.

[124] *Id.*

[125] AR 121–29.

[126] AR 128.

[127] AR 127–29.

[128] AR 128.

evidence did not establish that Mr. Grant satisfied the "paragraph C" criteria for Listings 12.02 or 12.04.[129]

### 2.1.11 Lifelong Medical Care — Treating

Beginning December 26, 2012, Mr. Grant sought medical treatment at Lifelong Medical Care in East Oakland, California.[130] Mr. Grant went to Lifelong Medical Center until at least August 14, 2015.[131] Mr. Grant mainly saw Aguia Heath, M.D.,[132] and Serena Wu, M.D.;[133] both were his primary-care physicians.[134] Mr. Grant also regularly met with pharmacists, who advised him about his medications, stressed the importance of compliance with all of his medications, and encouraged him to adopt a healthier lifestyle.[135] On a less frequent basis, Mr. Grant saw Morgen Yao-Cohen, M.D.,[136] a physician in Lifelong Medical Care's congestive heart failure practice group,[137] and Eric Fuller, D.P.M., a podiatrist.[138] Mr. Grant also saw social workers[139] at Lifelong Medical Center for his depression, anxiety, and polysubstance abuse, and they conducted home visits.[140] Mr. Grant visited Lifelong Medical Care for a variety of health issues, including foot pain,[141] issues with foot care,[142] foot and leg swelling,[143] a chronic cough,[144] rashes,[145] and ear

---

[129] *Id.*

[130] AR 921.

[131] AR 1574.

[132] *See, e.g.*, AR 876–90, 897–908, 912–44, 969–80, 984–92, 1224–27, 1234–42, 1247–59, 1263–66, 1269–72, 1277–79.

[133] *See, e.g.*, AR 1035–37, 1176–79, 1184–94, 1199–1204, 1212–23, 1579–85, 1593–96.

[134] The record indicates that Dr. Wu is a family practice physician. *See* AR 1037.

[135] *See, e.g.*, AR 894–96, 960–61, 966–68, 1168–72, 1180–83, 1195–98, 1205–11, 1228–33, 1260–62, 1267–68, 1273–76, 1560–63, 1586–87.

[136] *See, e.g.*, AR 1164–67, 1173–75, 1574–78, 1588–92.

[137] AR 1187.

[138] *See, e.g.*, AR 891–93, 909–11, 981–83, 1243–46.

[139] Mr. Grant saw Claudia Madison, LCSW, in August 2013 for his depression and alcohol abuse. *See* AR 993–94, 1569–70. He also saw Jennifer Wachter, LCSW, in July 2015 for his anxiety. *See* AR 1550–52.

[140] Brigitte Peltekof and Celina Ramirez, LCSW, visited Mr. Grant at his home in June 2014. *See* AR 1565–66. Ms. Peltekof returned in April 2015 for another home visit with Clipper Young, Pharm.D., and a student intern. *See* AR 1562–63.

[141] *See, e.g.*, AR, 905, 977.

problems,[146] but practitioners at Lifelong Medical Care also addressed many of his chronic health conditions, such as obstructive sleep apnea,[147] polysubstance abuse,[148] cardiomyopathy,[149] hypertension,[150] edema,[151] respiratory failure,[152] congestive heart exacerbation or failure,[153] cellulitis,[154] kidney disease,[155] noncompliance with his medications, dietary regimen, or use of his CPAP machine,[156] shortness of breath or breathing problems,[157] intertrigo,[158] and morbid obesity.[159] In addition to prescribing and adjusting Mr. Grant's medications,[160] the physicians at Lifelong Medical Care repeatedly encouraged Mr. Grant to adopt healthy lifestyle changes, such

---

[142] *See, e.g.*, AR 909, 909–11, 977, 989, 1245.

[143] *See, e.g.*, 909–11, 921, 956, 1243–46.

[144] *See, e.g.*, AR 951, 956, 1250.

[145] *See, e.g.*, AR 901, 905, 917, 973, 977.

[146] *See, e.g.*, AR 901, 905, 962, 969, 973, 977.

[147] *See, e.g.*, AR 903, 908, 992, 1263, 1266, 1269, 1579, 1593.

[148] *See, e.g.*, AR 912, 917, 924, 951, 956, 959, 969, 971, 986, 989, 992–93, 1184, 1239, 1254, 1263, 1269, 1586.

[149] *See, e.g.*, AR 912, 924, 951, 956, 986, 1212, 1220–21, 1227, 1242, 1254, 1256. "Cardiomyopathy is 'a general diagnostic term designating primary noninflationary disease of the heart muscle, often of obscure or unknown etiology and not the result of ischemic, hypertensive, congenital, valvular, or pericardial disease.'" *Hargrove v. Colvin*, No. 2:14-cv-196-KS-MTP, 2016 WL 418172, at *1 n.1 (S.D. Miss. Jan. 4, 2016) (quoting *Dorland's Illustrated Medical Dictionary* 287 (29th ed. 2000)).

[150] *See, e.g.*, AR 924, 951, 962, 971, 1184, 1239, 1242, 1247, 1250–51, 1254, 1276–77, 1279, 1574, 1579, 1586.

[151] *See, e.g.*, AR 959, 986, 1246, 1254, 1266.

[152] *See, e.g.*, AR 899, 971 (same visit repeated in the record).

[153] *See, e.g.*, AR 992, 1167, 1175–76, 1184, 1192, 1199, 1216, 1579, 1586, 1593.

[154] *See, e.g.*, AR 1192.

[155] *See, e.g., id.*

[156] *See, e.g.*, AR 905, 961, 1212, 1266.

[157] *See, e.g.*, AR 1216, 1218.

[158] *See, e.g.*, AR 1227, 1254. Intertrigo is characterized as "a rash that shows up between the folds of skin. It is a very common skin rash that can crop up throughout life." *Williams-Bey v. Carpenter*, No. 14-0490-CG-C, 2015 WL 4602871, at *2 n.3 (S.D. Ala. July 29, 2015) (quoting WebMD, http://webmd.com/skin-problems-and-treatments/guide/intertrigo-symptoms-causes-treatment-risk_factors_).

[159] *See, e.g.*, AR 1254.

[160] *See, e.g.,* AR 899, 903, 920, 924, 954, 959, 964, 967, 1178, 1237.

as limiting his sodium intake to reduce his hypertension,[161] increasing his daily exercise regimen,[162] restricting his fluid intake to prevent fluid overload,[163] eating healthier,[164] and monitoring his blood pressure at home with a blood pressure monitor that they provided for him.[165] Mr. Grant's physicians repeatedly advised him to decrease his alcohol intake or abstain from cocaine and alcohol use altogether.[166] They also advised Mr. Grant to increase his compliance with his medications[167] and the use of his CPAP machine, stressing that it needed to be fitted properly.[168] They also provided assistance with leg and foot care, such as debriding and trimming his nails and wrapping his legs when he suffered from edema.[169]

Dr. Wu — addressed by the ALJ because she did an RFC assessment — saw Mr. Grant approximately twelve times between June 2014 and August 2015.[170] Dr. Wu began treating Mr. Grant on June 26, 2014.[171] The record reflects that Mr. Grant's height and weight of 5'8'' and 361.5 pounds.[172] Dr. Wu saw Mr. Grant for a check-up and noted that Mr. Grant's previous primary-care physician was Dr. Heath.[173] Dr. Wu listed Mr. Grant's chronic problems (including health-care maintenance, morbid obesity, obstructive-sleep apnea, hypertension, cardiomyopathy, chemical dependency, alcohol abuse, a history of myocardial infarction,[174] tinea,[175] pedal edema,

---

[161] See, e.g., AR 1167, 1261, 1276.

[162] See, e.g., AR 967, 1175, 1261, 1584.

[163] See, e.g., AR 895, 967, 1167, 1591.

[164] See, e.g., AR 895, 967, 1175, 1584.

[165] See, e.g., AR 1255.

[166] See, e.g., AR 899, 959, 971, 980.

[167] See, e.g., AR 1197, 1211, 1255, 1591.

[168] See, e.g., AR, 908, 980, 1190.

[169] See, e.g., AR 983, 1245–46.

[170] See, e.g., AR 1176–79, 1184–94, 1199–1204, 1212–23, 1579–85, 1593–96.

[171] AR 1221.

[172] AR 1223.

[173] AR 1221.

[174] A myocardial infarction is commonly known as a heart attack. See Avello v. Colvin, No. 2:13-cv-00504-JAD-GWF, 2014 WL 5506746, at *2 (D. Nev. Sept. 16, 2014).

cocaine use, intertrigo, TMJ (temporomandibular joint) arthropathy,[176] depression, and gait instability, and reviewed his medical history (including Mr. Grant's active medications, allergies, and family medical history).[177] Dr. Wu treated Mr. Grant for cardiomyopathy and stopped two of his medications, but she was unable to review his medications fully because Mr. Grant failed to bring them to his appointment.[178]

On July 28, 2014, Dr. Wu completed an RFC evaluation for Mr. Grant.[179] Dr. Wu recorded "date of first contact" as December 26, 2012, presumably because this is the date that Mr. Grant first began medical treatment at Lifelong Medical Center.[180] She diagnosed him with morbid obesity, obstructive sleep apnea, hypertension, and cardiomyopathy, with a fair prognosis.[181] She listed his symptoms as severe fatigue, limited mobility, and limited ability to ambulate.[182] She expected his impairments to last over 12 months, and she noted that Mr. Grant was not a malingerer.[183] During a typical eight-hour workday, with the ordinary breaks, Mr. Grant's pain symptoms were "constantly" severe enough to interfere with the attention and concentration necessary to sustain simple, repetitive, work tasks.[184] Mr. Grant could tolerate moderate stress.[185] In a competitive work situation, Mr. Grant could not sit (at any one time) for more than 45

---

[175] Tinea is usually a fungal and bacterial infection. *See Rickert v. Astrue*, No. 1:07CV122, 2008 WL 820170, at *3 n.5, n.6 (N.D. W. Va. Mar. 26, 2008) (citations omitted).

[176] Arthropathy is defined as "an inflammatory joint disease, such as rheumatoid arthritis." *Sandoval v. Barnhart*, 209 F. App'x 820, 824 n.2 (10th Cir. 2006) (quoting Taber's Cyclopedic Medical Dictionary 169 (19th ed. 2001)).

[177] AR 1221–23.

[178] AR 1223.

[179] AR 1035–38.

[180] AR 921, 1035, 1221.

[181] AR 1035.

[182] *Id.*

[183] AR 1036.

[184] *Id.*

[185] *Id.*

minutes, and his limitations (considered in combination) were likely to produce good and bad days, resulting in absences from work of about two days a month.[186]

Dr. Wu next saw Mr. Grant on August 7, 2014 for a check-up appointment concerning his breathing issues.[187] He weighed 367.5 pounds.[188] Mr. Grant complained of shortness of breath and edema.[189] He was not compliant with his Lasix medication because he had gone "away for a few days" and failed to bring it with him.[190] Mr. Grant reported that "he at baseline sle[pt] sitting up" and "denie[d] nocturnal dyspnea or orthopnea."[191] Dr. Wu treated Mr. Grant for cardiomyopathy, adjusted his medications, and ordered testing.[192] She "g[ave] [Mr. Grant] strict ED (emergency department) precautions."[193] Dr. Wu may have next seen Mr. Grant on August 12, 2014, when she conducted "chart prep."[194]

Mr. Grant next saw Dr. Wu on August 21, 2014.[195] He weighed 378 pounds at this visit.[196] He was in the hospital and requested a larger hospital bed.[197] Mr. Grant presented with cardiomyopathy, and his symptoms were improving since he had become more compliant in taking Lasix as prescribed.[198] Dr. Wu "discussed with [Mr. Grant] going to another cardiologist" in order to obtain "better documentation and communication," and Mr. Grant was amenable to

---

[186] AR 1036–37.

[187] AR 1218–20.

[188] AR 1220.

[189] AR 1218.

[190] *Id.*

[191] *Id.* (punctuation altered). "Orthopnea is the sensation of breathlessness in the recumbent position, relieved by sitting or standing." *Jackson*, 2017 WL 4937612, at *4 n.4 (quoting Vaskar Mukerji, *Dyspnea, Orthopnea, and Paroxysmal Nocturnal Dyspnea*, Clinical Methods: The History, Physical, and Laboratory Examinations (3rd ed. 1990), https://www.ncbi.nlm.nih.gov/books/NBK213/).

[192] AR 1220.

[193] *Id.*

[194] AR 1203. The date of this visit is somewhat ambiguous in that October 10, 2014 is also listed.

[195] AR 1212–15.

[196] AR 1214.

[197] *Id.*

[198] AR 1212.

doing so.[199] Dr. Wu addressed Mr. Grant's chronic health problems, namely congestive heart failure, his history of myocardial infarction, obstructive sleep apnea, and hypoventilation associated with obesity.[200] She conducted a physical exam, and Mr. Grant's respiratory and cardiovascular systems were normal.[201] His condition was stable.[202] Dr. Wu ordered a larger hospital bed and referred him to see a cardiologist.[203]

Dr. Wu next saw Mr. Grant on November 12, 2014 for a check-up appointment concerning his congestive heart failure, and he also presented with a rash on the left side of his face that had persisted for two weeks.[204] Her report — like others — details his history, his medical problems, his vital signs (including his weight of 372 pounds), and his high blood pressure (with the notation that Mr. Grant forgot to take his medication the night before so his blood pressure was high).[205] Mr. Grant did not have a follow-up appointment scheduled with his new cardiologist, but he indicated that he would make one so that he could discuss the results of a stress test he had taken.[206] Dr. Wu diagnosed Mr. Grant with a mild tinea infection on the left side of his face and prescribed an antifungal cream.[207] She performed a physical exam, and all of her findings were normal.[208] She referred Mr. Grant to a nutritionist and "encouraged" him to schedule an appointment with his cardiologist.[209]

---

[199] *Id.*

[200] *Id.*

[201] AR 1214.

[202] *Id.*

[203] AR 1215.

[204] AR 1199–1202.

[205] AR 1199.

[206] AR 1202.

[207] *Id.*

[208] AR 1201.

[209] *Id.*

Dr. Wu next saw Mr. Grant on December 17, 2014 for a follow-up appointment concerning his recent hospital admission for cellulitis and acute kidney injury on chronic kidney disease.[210] Mr. Grant stopped taking Lasix during his hospital stay due to his kidney injury, but Dr. Wu indicated that she wanted to restart Lasix once his kidney injury was resolved.[211] She deferred prescribing Lasix until she received the laboratory results from Mr. Grant's recent hospital stay.[212] She conducted a physical exam, and all of her findings were normal.[213]

Mr. Grant next saw Dr. Wu on January 8, 2015 for a routine visit.[214] Mr. Grant was previously admitted to Alta Bates Summit Medical Center, where he had been diagnosed with diverticulitis and prescribed medication.[215] Mr. Grant reported "great improvement" with respect to his heart-failure symptoms because he had lost some weight.[216] At the time of this visit, Mr. Grant weighed 351 pounds.[217] Mr. Grant "was off diuretics completely, and [he] report[ed] no active cellulitis."[218] Mr. Grant reported, however, that he continued to suffer from lymphedema.[219] He reported that he was considering undergoing a cardiology procedure and was due to see a cardiologist the following month.[220] Dr. Wu conducted a physical exam of Mr. Grant, and all of her findings we normal except for some "lichenified patches" on his left shin.[221] She adjusted his medications and ordered a new mask for his CPAP machine.[222]

---

[210] AR 1192–94.

[211] AR 1194.

[212] Id.

[213] Id.

[214] AR 1188–91.

[215] AR 1188.

[216] Id.

[217] AR 1190.

[218] AR 1188.

[219] Id.

[220] Id.

[221] AR 1190.

[222] AR 1190.

Dr. Wu next saw Mr. Grant on March 30, 2015 for a follow-up appointment concerning his chronic heart failure, hypertension, chronic cough, and mental health issues.[223] He weighed 379.5 pounds at this visit.[224] Mr. Grant had recently been admitted to the intensive-care unit for chronic heart-failure exacerbation, and Dr. Wu scheduled an appointment for Mr. Grant at a congestive heart-failure group.[225] She deferred adjusting Mr. Grant's medication for congestive heart failure until she could obtain additional laboratory test results.[226] She also waited to see Mr. Grant's discharge summary before putting him back on certain medications for hypertension.[227] Dr. Wu "suspect[ed]" that Mr. Grant's chronic cough was due to a "multitude" of factors, including his chronic heart failure and "possibly undiagnosed COPD" (chronic obstructive-pulmonary disease).[228] She prescribed medication and ordered an inhaler for Mr. Grant.[229] She also referred Mr. Grant to therapy for his depression.[230] Lastly, Dr. Wu conducted a physical exam, and all of her findings were normal.[231]

Mr. Grant next saw Dr. Wu on April 13, 2015 for a follow-up visit concerning his congestive heart failure.[232] Mr. Grant's weight was "up from baseline," as he weighed 384 pounds.[233] Mr. Grant's congestive heart failure was "poorly controlled," and he had "pitting edema up to [his] mid thigh."[234] Mr. Grant indicated that he was going to a lymphedema clinic and that he would like a referral for general physical-therapy outpatient services at the same location.[235] Dr. Wu

---

[223] AR 1184–87.

[224] AR 1186.

[225] Id.

[226] Id.

[227] Id.

[228] Id.

[229] Id.

[230] AR 1187.

[231] AR 1186.

[232] AR 1176–79.

[233] AR 1176.

[234] Id.

[235] Id.

noted that "home health" care services "was ordered" for Mr. Grant, but Mr. Grant reported that "no one ha[d] shown up yet."[236] Dr. Wu conducted a physical exam, and all of her findings were normal except for Mr. Grant's chronic pitting edema.[237] Dr. Wu adjusted Mr. Grant's medications, made an appointment for Mr. Grant at the congestive heart failure group, and indicated she would check on the status of his home health referral.[238]

Dr. Wu next saw Mr. Grant on June 23, 2015 for a follow-up appointment concerning his lymphedema and congestive heart failure.[239] Dr. Wu referred him for home health care for his lymphedema, and she also referred him to see a nutritionist.[240] Mr. Grant's condition was "worsening since [he] left the lymphedema clinic," and he did not have a "home RN (registered nurse) to help him with [his] leg wrappings."[241] Because of Mr. Grant's body shape, he was unable to wrap his legs by himself.[242] Mr. Grant had not been "watching [his] diet," and his congestive heart failure was difficult to control.[243] Dr. Wu spoke with him "extensively" about his diet and exercise regimen and made an appointment for him at the congestive-heart-failure group.[244]

Mr. Grant's last visit in the record with Dr. Wu was an August 3, 2015 for a follow-up concerning his congestive-heart failure, hypertension, and sleep apnea.[245] Mr. Grant recently experienced shortness of breath, and he also had gained weight since his last visit.[246] He weighed 403 pounds.[247] Dr. Wu conducted a physical exam, and all of her findings were normal.[248] She

---

[236] Id.

[237] AR 1178.

[238] Id.

[239] AR 1583–85.

[240] AR 1584.

[241] Id.

[242] Id.

[243] Id.

[244] Id.

[245] AR 1579–82, 1593–96 (same visit repeated in the record).

[246] AR 1579, 1593.

[247] AR 1581, 1595.

[248] AR 1581, 1595.

noted that Mr. Grant was supposed to have a follow-up appointment with a cardiologist but failed to make one.[249] Mr. Grant's blood pressure "contin[ued] to be elevated," and Dr. Wu made an appointment for Mr. Grant at a blood-pressure clinic.[250] Because Mr. Grant indicated that his settings for his CPAP mask were not as effective as they had been, Dr. Wu scheduled a sleep-study retest for him.[251] Dr. Wu conducted a physical exam, and all of her findings were normal.[252] She also adjusted his medications.[253]

### 2.1.12   Vincent Baldwin M.D. — Treating

Dr. Baldwin treated Mr. Grant from January 6, 2012 to April 3, 2015 for pain management resulting from a right ankle fracture in 2010.[254] He diagnosed him with "Status post Fracture of the Right Ankle," chronic pain syndrome, keloid[255]/ right ankle surgical scar, anxiety/depression, and bilateral lower extremity edema.[256] Dr. Baldwin also diagnosed Mr. Grant with instability in his right ankle[257] and lower back pain[258] at subsequent visits. His treatment included acupuncture with electrostimulation, lower extremity massages, medication management, behavioral modification techniques, vocalization of Mr. Grant's psychological/emotional issues, a home exercise program, and psychological/emotional support.[259] Dr. Baldwin recommended that Mr. Grant receive acupuncture and massage therapy two to three times weekly for the following twelve to sixteen

---

[249] AR 1579, 1593.

[250] *Id.*

[251] *Id.*

[252] AR 1581, 1594.

[253] *Id.*

[254] AR 1066–1154.

[255] "A keloid is 'a raised area caused by an overgrowth of scar tissue.'" *Buford*, 2015 WL 8042210, at *4 n.8 (E.D.N.Y. Dec. 3, 2015) (quoting Mayo Clinic, *Keloid*, http://www.mayoclinic.org/keloid/img20007748).

[256] AR 1152.

[257] *See, e.g.*, AR 1138, 1141, 1128.

[258] *See, e.g.*, AR 1067, 1070 (same visit repeated in the record).

[259] AR 1152–53.

weeks.[260] He prescribed pain medication and discussed changing Mr. Grant's sleeping habits, decreasing the amount of time Mr. Grant spent standing, and taking up aquatic aerobics. For subsequent visits, Dr. Baldwin would see Mr. Grant "as needed for medication management, treatment for flare-ups and exacerbations, and provide the necessary psychological and emotional support."[261] Mr. Grant was "temporarily totally disabled" and "unable to do modified or his regular occupation."[262] In March 2012, Mr. Grant's conditions had improved, he had been undergoing gait training to avoid falling, and while he was still "totally disabled and unable to do modified work," Dr. Baldwin "suspect[ed] that he should be able to return to work within . . . 3–4 months."[263] Subsequent recent treatment records indicate, however, that his conditions worsened when he discontinued acupuncture, electrostimulation, and massage therapy because his insurance carrier "denied the utilization of acupuncture and electrical stimulation and hands-on massage therapy as primary treatment modalities."[264]

    At his most recent visit in April 2015, Mr. Grant continued to suffer from right ankle pain, right knee pain, and lower back pain as well as other chronic health conditions, including edema, congestive heart failure, pickwickian syndrome[265] and severe narcolepsy.[266] He recently had been hospitalized numerous times for "hypertension and congestive heart failure as well as [an] inability to ambulate due to the pain and discomfort in his lower extremities."[267] Dr. Baldwin diagnosed Mr. Grant with a "right ankle fracture status post ORIF (open reduction internal fixation)," right knee strain/osteoarthritis, chronic lower back pain/strain, congestive heart failure,

---

[260] AR 1153.

[261] AR 1153–54.

[262] AR 1154.

[263] AR 1119.

[264] AR 1079–80.

[265] Pickwickian syndrome is characterized "as a condition in which 'impairment of breathing leads to hypercapnia, a reduced effect of $CO_2$ in simulating respiration, hypoxia, cor pulmonale, and a risk of premature death." *Dyson v. Massanari*, 149 F. Supp. 2d 1018, 1021 n.3 (N.D. Ill. July 9, 2001) (quoting *Merck Manual* 60 (17th ed. 1999)).

[266] AR 1067, 1170.

[267] *Id.*

morbid obesity, severe lower extremity and abdominal edema, anxiety/depression, and narcolepsy.[268] Dr. Baldwin continued to prescribe pain medication.[269] Mr. Grant's depression and anxiety were "so severe" that Dr. Baldwin also prescribed medication "for severe anxiety spells."[270] Mr. Grant's "overall prognosis [was] quite poor," and Dr. Baldwin determined that he was "permanently disabled and will be so for the rest of his life."[271]

### 2.1.13   Berkeley Cardiovascular Medical Group — Treating

Dr. Wu referred Mr. Grant here for treatment for his cardiac condition.[272] The treatment records cover the period from September 11, 2014 to April 15, 2015 and reflect the following information.

On September 11, 2014, Duane Stephens, M.D., a cardiologist, evaluated Mr. Grant, noting his past medical history, his medications, his physical condition (including weight of 370 pounds, normal gait, and absent lower-extremity edema), and diagnosed him with cardiomyopathy and obesity, among other conditions, and said that further cardiac evaluation was needed.[273] He underwent tests in September and October 2014.[274] Mr. Grant came in for an office visit in January 2015 after he had recently been hospitalized for a leg infection and diverticulitis.[275] He weighed 354 pounds.[276] Dr. Stephens's impression was that Mr. Grant suffered from cardiomyopathy, old MI (anterior wall myocardial infarction), and obesity.[277] Dr. Stephens planned to keep Mr. Grant on the "chronic medical therapy" he was receiving for his cardiomyopathy and myocardial infarction, and while Mr. Grant's obesity had improved since his

---

[268] AR 1069, 1072.

[269] *Id.*

[270] AR 1068, 1071.

[271] AR 1069, 1072.

[272] AR 1212, 1542.

[273] AR 1542–43.

[274] AR 1524–25, 1530–31.

[275] AR 1547–48.

[276] AR 1547.

[277] AR 1548.

last visit, Dr. Stephens "instructed" Mr. Grant on a low-fat diet.[278] Mr. Grant saw Dr. Stephens again for a follow-up in April 2015.[279] Dr. Stephens diagnosed Mr. Grant with the same medical conditions and determined that further cardiac evaluation was needed for Mr. Grant's myocardial infarction.[280] He did not make any changes to Mr. Grant's medical therapy.[281]

### 2.1.14 Eden Medical Center — Treating

Dr. Wu referred Mr. Grant for therapy at the lymphedema clinic at Eden Medical Center.[282] Mr. Grant went to Eden Medical center from January 14, 2015 to June 5, 2015 for physical therapy and lymphedema treatment.[283] In January 2015, Mr. Grant saw Allyn Martinez, OT, for a lymphedema evaluation.[284] Ms. Martinez reviewed Mr. Grant's medical history.[285] Her clinical impression was that Mr. Grant suffered from bilateral stage 3 edema in his right lower leg and entire left leg and that Mr. Grant had numerous other impairments including his skin integrity, a risk of infection, and a lack of a lymphedema management program.[286] She planned a therapeutic program lasting four to six weeks, with Mr. Grant's receiving manual lymph drainage, bandaging/compression garments, a home exercise program, and the use of a compression pump.[287] Over the course of Mr. Grant's treatment, occupational therapists repeatedly cleaned and wrapped Mr. Grant's lower extremities in compression bandages[288] and discussed the benefits of obtaining compression garments.[289] They also taught Mr. Grant and his brother how to bandage

---

[278] *Id.*

[279] AR 1544–46.

[280] AR 1546.

[281] *Id.*

[282] AR 1308–09, 1392–94.

[283] AR 1286–1485.

[284] AR 1297–1302.

[285] AR 1311–14.

[286] AR 1300.

[287] AR 1301.

[288] *See, e.g.*, AR 1320, 1331, 1340, 1362, 1471.

[289] *See, e.g.*, AR 1340.

United States District Court
Northern District of California

his lower extremities.[290] In April 2015, Marina Villarey, OT, saw Mr. Grant and found that he was "progressing slower than anticipated toward [his] goals"[291] of having effective compression garments, being able to effectively manage his lymphedema at home, being able to stand for longer than 15 minutes, and being able to walk approximately one block "with less pain."[292] His progress continued to be slower than anticipated the following month due to multiple missed appointments, lack of compliance at home, and an inability to purchase compression garments.[293]

In a May 2015 physical therapy evaluation with Raphael Joson, PT, Mr. Grant's goal was to get back into shape, particularly in terms of increasing his ability to walk, stand, and engage in recreational activities.[294] Mr. Joson characterized Mr. Grant's rehabilitation potential as "fair" because he expected Mr. Grant's progress "to be hindered by the severity and irritability of [his] condition" as well as "the presence of comorbitities" such as chronic heart failure.[295] Mr. Joson's plan for Mr. Grant included "Manual Therapy, Therapeutic Exercise, Therapeutic Activity, Neuro Re-Education, Patient Education, Gait Training, Caregiver/Family Training/Education, ADL Training," and "Aquatic Therapy and Balance Training."[296] As planned, he started Mr. Grant in pool therapy during his next visit three days later.[297]

### 2.2    Medical Expert Testimony: James Todd, M.D. — Non-Examining

Dr. Todd, a specialist in cardiology and internal medicine, testified by telephone at the July 20, 2015 hearing.[298] In response to questions by the ALJ, and based on his review of Exhibits 1F–18F the medical records,[299] Dr. Todd testified as follows.

---

[290] *See, e.g.*, AR 1351, 1362.

[291] AR 1372.

[292] AR 1300.

[293] AR 1416, 1450, 1470.

[294] AR 1383–84.

[295] AR 1383.

[296] AR 1384.

[297] AR 1402–03, *see also* AR 1425–27, 1458–60, 1479–81 (subsequent pool therapy visits).

[298] AR 50, 60–78; *see also* AR 1039–41 (Dr. Todd is board certified in cardiology and internal medicine).

Mr. Grant had several impairments.[300]

First, he had pain in various parts of his body ("particularly in a non-healing fracture of the right ankle"), but there was "no documentation of physical therapy"[301] or evidence that Mr. Grant used an assistive walking device.[302] "My estimation is that the pain is definitely present, but not so severe as to interfere with routine repetitive tasks."[303]

Second, he had "restrictive lung disease by pulmonary function test."[304] He was hospitalized in 2010 and on June 26, 2013; "After he recovered in June of 2013[,] it would appear that he's relatively well as far as his lungs and his heart."[305]

Third, he was morbidly obese.[306] Dr. Todd lost track of his weight but said it was "well in the high 200s," which "restricts his lungs from taking a full breath."[307]

Fourth, he had a history of polysubstance abuse, including possible active use of cocaine and active use of alcohol.[308]

Fifth, he had a depression problem but had not sought care.[309]

Sixth, he "has a global left ventricular ejection fraction, with some evidence of reversible ischemia on the lateral wall and the anterior septal region, with an ejection fraction of 41 percent."[310]

---

[299] AR 60.

[300] AR 61.

[301] *Id.*

[302] *Id.*

[303] *Id.*

[304] *Id.*

[305] *Id.*

[306] *Id.*

[307] *Id.*

[308] AR 62.

[309] *Id.*

[310] *Id.*

Dr. Todd disagreed with Dr. Wu's RFC, thinking Mr. Grant was "overrated in terms of his ability to stand and walk."[311] Dr. Todd testified that there should be a six-minute walk test and was unable to locate any physical therapy notes.[312] He also indicated that there was no record as to whether Mr. Grant had ever seen a cardiologist.[313]

Dr. Todd also testified about Mr. Grant's history of polysubstance abuse, pointing out places in the record that indicated Mr. Grant drank one or two pints of vodka on a daily basis and worked in a liquor store.[314] Dr. Todd testified that "ongoing alcohol use" weakens the heart.[315] He added that Mr. Grant was not compliant with his medications.[316] He mentioned that Mr. Grant had seen Claudia Madison, LCSW, at Lifelong Medical Center, whom he referred to as a "psychologist, possibly," and that Mr. Grant had discussed his cocaine use with her.[317] Dr. Todd further mentioned that Mr. Grant had been "too sleepy during [his session with Ms. Madison] to be able to sign an informed consent."[318] Dr. Todd attributed Mr. Grant's sleepiness to his substance abuse, rejected Mr. Grant's explanation that sleep apnea was causing him to be sleepy, and discounted the possibility that Mr. Grant suffered from narcolepsy on the grounds that it was "not mentioned anywhere in the record."[319]

Dr. Todd then made several recommendations.[320]

First, he recommended that Mr. Grant undergo a six-minute walk test "to see what his problems are in terms of walking and whether he requires a walker or whether he requires a cane."[321]

---

[311] AR 63.

[312] *Id.*

[313] AR 63–64.

[314] AR 64.

[315] AR 65.

[316] AR 65.

[317] *Id.* at 67.

[318] *Id.*

[319] AR 67.

[320] AR 70.

Second, he suggested that the ALJ "get a list of [Mr. Grant's] current medications and then verify it with the local pharmacy that he uses" to determine whether Mr. Grant has been compliant with his medications.[322]

Third, Dr. Todd recommended that the ALJ "get notes from [Mr. Grant's] physical therapy."[323]

Turning to the RFC, Dr. Todd concluded that, if he were to "take away the ankle problem," Mr. Grant would have "no trouble" performing "light work, which would be six hours of standing and walking."[324] Even factoring in Mr. Grant's ankle injury, Mr. Todd found "no reason" why Mr. Grant would be unable to perform sedentary work.[325] In response to questioning from Mr. Grant's lawyer, Dr. Todd responded that any limitations that Mr. Grant experienced as a result of his edema were entirely of his own making:

> The bottom line is [Mr. Grant is] causing edema by his bad habits. He needs to take his medications as directed, and he needs to stop alcohol. So if you're going to say, well he needs to drink a pint or two of vodka every day, which it says he does, and, you know, he's not going to take his cardiac meds, then he is, in fact, disabled by edema.

> But it's caused by him, not by — if he followed medical treatment, this would not be present. Yes, he has edema, and, yes, that's limiting, but the treatment, he's not following the treatment.[326]

### 2.3   Mr. Grant's Testimony

In response to questions by the ALJ, Mr. Grant testified as follows.[327]

He last worked in 2010 in security and in-home care.[328] He stopped working because he broke his ankle and got six screws and a plate.[329] He looked for security and in-home care work so that

---

[321] *Id.*

[322] *Id.*

[323] *Id.*

[324] AR 76.

[325] AR 77.

[326] AR 78.

[327] AR 52–91.

[328] AR 52.

[329] AR 52–53.

he could pay his bills.[330] He fell asleep a lot due to sleep apnea.[331] He also could not do actually do the work because his legs hurt due to lymphedema and his injured ankle.[332] He looked for work where he could sit down most of the day.[333] He worked "under the table"[334] in 2013 at a liquor store, where he would sit behind the counter for a few hours in the morning and make sure no one was stealing.[335] He did not think of it as a "real job" because the store owner was "doing [him] a favor," paying Mr. Grant's bills for him in exchange for his supervision.[336] He had been going to Lifelong Medical Care for counseling as well as Alcoholics Anonymous meetings.[337] He used a cane for walking around the house, and a walker for long distances.[338] When he walked, he needed to take breaks every four or five minutes, and he could walk a half block but had to "stop a couple times" because it was hard for him to breathe and because he sometimes felt pain.[339] For about two years, an in-home care worker has helped him do "the chores, the shopping, cooking, helping put clothes on . . . . and bathing."[340] He took his medicine regularly, but he had trouble remembering to take them, and his in-home care worker helped by reminding him.[341] He went to physical therapy at Eden Medical Center for his ankle, and including physical therapy "in the pool."[342] He

---

[330] AR 73.

[331] AR 53.

[332] AR 73.

[333] AR 53.

[334] AR 89.

[335] AR 89–90.

[336] *Id.*

[337] AR 68–69.

[338] AR 79.

[339] AR 84–85.

[340] AR 80–81.

[341] AR 87 ("I was taking my medicines regularly, but sometime I don't remember if I took my medicine, I didn't take it, so sometime that just throw me off. My in-home care worker, she make sure I take my medicine on time every day, because sometimes, I think I took my medicine, then I really haven't.").

[342] AR 73–74.

slept with a CPAP machine but still feels tired during the day, frequently dozing off.[343] It was difficult for him to lie flat because "then [he] can't breathe."[344] Due to edema, he contended with leg swelling, kept his legs wrapped up, and sometimes had to elevate them to mitigate the symptoms.[345] If he elevated his "feet too long [he] g[ot] like panic attacks," feeling anxious because elevating his feet made it harder for him to breathe.[346] He could elevate his legs only for "[a]bout 10 minutes because I don't — that's as long as I can take it."[347] Abstaining from alcohol had not resulted in any noticeable improvement in his symptoms.[348]

### 2.4 Vocational Expert Testimony: Timothy Farrell

In response to questions posed by the ALJ at the July 20, 2015 hearing, VE Farrell testified that since 2000, Mr. Grant worked as a security guard (semi-skilled with an SVP of 3, light exertion), care-giver (semi-skilled SVP of 3, medium exertion), construction worker (semi-skilled SVP 4; heavy exertion), and parking lot cashier (unskilled with an SVP of 2, light work).[349] The ALJ did not pose any hypotheticals to VE Farrell concerning an individual of Mr. Grant's age, education, and prior work experience.

### 2.5 Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether Mr. Grant was disabled and concluded he was not.[350]

At step one, the ALJ found that that Mr. Grant had not engaged in substantial gainful activity since his alleged onset date of July 30, 2010.[351]

---

[343] AR 82.

[344] AR 83.

[345] *Id.*

[346] AR 84.

[347] *Id.*

[348] AR 86.

[349] AR 55, 58.

[350] AR 32–42.

[351] AR 34.

1    At step two, the ALJ found that Mr. Grant had the following severe impairments: "status-post

2    right ankle fracture; cellulitis and lymphedema of the right leg; morbid obesity; history of acute

3    heart failure; sleep apnea; hypertension; and substance abuse disorder, active (ETOH and

4    cocaine)."[352] The ALJ also determined that Mr. Grant's mental impairments were not severe.[353]

5        At step three, the ALJ found that Mr. Grant did not have an impairment or combination of

6    impairments that met or medically equaled the severity of a listed impairment.[354] The ALJ

7    considered "sections 1.02, 3.10, 4.02, and 12.09, which describe major dysfunction of a joint,

8    sleep related breathing disorders, chronic heart failure and substance addiction disorders

9    respectively . . . ."[355] Also, "pursuant to Social Security Ruling 02-1p, [the ALJ] considered [Mr.

10   Grant's] obesity and combined effects of his impairments."[356] The ALJ found that Mr. Grant

11   "does not have a combination of impairments that meet or medically equal any listed impairment

12   in Appendix 1 to Subpart P of Regulations No. 4."[357] He agreed with and adopted Dr. Todd's

13   conclusion that Mr. Grant's "impairments, singly or in combination, does [sic] not meet or equal a

14   listing." [358]

15       At step four, the ALJ found that Mr. Grant had the RFC "to perform sedentary work as defined

16   on a function-by-function basis in 20 C.F.R. 404.1567(a) and 416.967(a), except he cannot climb

17   ladders, ropes or scaffolds and must avoid noxious fumes and extreme cold, heat, and

18   humidity."[359] In reaching this RFC determination, the ALJ relied "for the most part on the

19   assessment of Dr. Todd, according his opinion great weight because it was consistent with the

---

[352] AR 34.

[353] AR 35–36.

[354] AR 36.

[355] *Id.*

[356] *Id.*

[357] *Id.*

[358] *Id.*

[359] AR 37.

preponderance of the longitudinal medical evidence of record as a whole" and because "Dr. Todd is the only physician in this case to have reviewed the entire medical evidence of record."[360]

The ALJ gave "less weight" to the medical opinions of Dr. Saphir, Dr. Mansour, and Dr. Giorgi "to the extent they [we]re inconsistent with the assessment of Dr. Todd."[361] He assigned no weight to the opinion of Dr. Chen, who was "removed from the DDS panel for his 'unprofessional manner and failure to adequately correct deficiencies in his CE reports.'"[362] He accorded "little weight" to Dr. Wu's assessment:

> I accord the assessment of Dr. Wu little weight because it is inconsistent with the preponderance of the longitudinal medical evidence of record as a whole. There is little basis for Dr. Wu to conclude [Mr. Grant] is unable to sit for at least 6 hours in an 8-hour workday, and that [Mr. Grant] is likely to be absent from work about 2 days per month. Her statement is conclusory and she did not cite specific findings or studies. Most tellingly, she failed to mention the likely pervasive adverse effects of [Mr. Grant's] substance abuse on his physical functioning. The foregoing leads me to conclude her statement amounts to mere advocacy rather than objective analysis.[363]

The ALJ then discredited Mr. Grant's testimony, finding his "allegation of complete debilitation [was] not generally credible."[364] The ALJ reasoned, relying on Dr. Todd's testimony, that Mr. Grant's "physical functioning would be greatly enhanced if he were to cease his substance abuse," and that the record contains "extensive evidence of non-compliance with medications and diet."[365] He questioned Mr. Grant's credibility due to his being "a poor historian" and noted that "his claims of abstinence from cocaine and reduced drinking conflict with most of the record."[366]

The ALJ then found that Mr. Grant was unable to perform any past relevant work experience and proceeded to step five.[367]

---

[360] AR 40.

[361] *Id.*

[362] AR 40 n.1 (quoting a "Corrective Action" letter).

[363] AR 40.

[364] *Id.*

[365] *Id.*

[366] *Id.*

[367] *Id.*

At step five, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the [Mr. Grant] can perform" and concluded that he was not disabled.[368]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

---

[368] AR 41–42.

other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §

1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled

within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20

C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden

shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419

(9th Cir. 1986).

## ANALYSIS

Mr. Grant contends the ALJ erred by (1) improperly weighing medical opinion evidence by

discounting and disregarding the medical opinions of treating and examining physicians without

providing specific and legitimate reasons supported by substantial evidence, (2) failing to include

depression, restrictive lung disease, bilateral edema, and congestive heart failure as severe impairments at step two, (3) failing to adequately consider Listings 12.04 and 4.11 at step three, (4) determining an RFC that was not supported by substantial evidence at step four, (5) failing to provide clear and convincing reasons for discrediting Mr. Grant's testimony, and (6) relying on an erroneous RFC at step five.[369]

## 1. Whether the ALJ Properly Weighed Medical-Opinion Evidence

Mr. Grant argues that the ALJ erred because he improperly weighed the medical-opinion evidence.[370] The court agrees with Mr. Grant. The court first discusses the law governing the ALJ's weighing of medical-opinion evidence and then analyzes the medical-opinion evidence under the appropriate standard.

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence."[371] *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830

---

[369] Mot. – ECF No. 18 at 2–22.

[370] *Id.* at 6–14.

[371] The Social Security Administration promulgated new regulations, including a new § 404.1521, effective March 27, 2017. The previous version, effective to March 26, 2017, governs based on the date of the ALJ's hearing, July 20, 2015.

(9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). An ALJ errs, however, when she "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Garrison*, 759 F.3d at 1012–13.

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any

medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)).

In addition to the medical opinions of the "acceptable medical sources" outlined above, the ALJ must consider the opinions of other "medical sources who are not acceptable medical sources and [the testimony] from nonmedical sources." *See* 20 C.F.R. § 416.927(f)(1). "Other sources" include nurse practitioners, physicians' assistants, therapists, teachers, social workers, spouses and other non-medical sources. 20 C.F.R. § 404.1513(a). The ALJ is required to consider observations by "other sources" as to how an impairment affects a claimant's ability to work, *id.*; nonetheless, an "ALJ may discount the testimony" or an opinion "from these other sources if the ALJ gives . . . germane [reasons] . . . for doing so." *Molina*, 674 F.3d at 1111 (internal quotations and citations omitted).

## 1.1 Dr. Snyder — Examining

The ALJ rejected Dr. Snyder's assessment:

> I reject the assessment of Dr. Snyder, according her opinion little weight. Although Dr. Snyder mentioned alcohol, she failed to address its effects and did not even include substance use or abuse in her diagnoses. She also noted [Mr. Grant] was a poor historian, thereby rendering anything he reported questionable and only marginally reliable. In addition, [Mr. Grant] denied cocaine use, which conflicts with the record. As a matter of fact, [Mr. Grant] tested positive for cocaine on May 4, 2013, indicating he was actively using around the time of the evaluation with Dr. Snyder. Moreover, he was falling asleep during the evaluation, and Dr. Snyder nonetheless based her conclusions on results that are questionable, as she herself had noted. The State agency medical examiners properly rejected Dr. Snyder's assessment and deemed all mental conditions nonsevere, including [Mr. Grant's] polysubstance abuse. Finally, there is no evidence of any mental health treatment, as [Mr. Grant] reported to Dr. Snyder, despite [Mr. Grant's] assertion of such at the hearing. Neither the medical expert nor I could find any, and the representative did not cite any at the hearing.[372]

---

[372] AR 35.

The ALJ's first reason for rejecting Dr. Snyder's opinion — that she did not address the effects of substance abuse — is not a specific and legitimate reason to discount her opinion. Generally, an ALJ conducts the five-step analysis before considering a claimant's drug and alcohol use:

> [A]n ALJ must first conduct the five-step inquiry without separating out the impact of alcoholism or drug addiction. If the ALJ finds that the claimant is not disabled under the five-step inquiry, then the claimant is not entitled to benefits and there is no need to proceed with the analysis under 20 C.F.R. §§ 404.1535 or 416.935. If the ALJ finds that the claimant is disabled and there is "medical evidence of [his or her] drug addiction or alcoholism," then the ALJ should proceed under §§ 404.1535 or 416.935 to determine if the claimant "would still [be found] to be disabled if [he or she] stopped using alcohol or drugs."

*Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001) (quoting 20 C.F.R. §§ 404.1535, 416.935) (holding that an ALJ must complete the five-step framework before looking to see whether a claimant would still be disabled if he or she were to cease from using drugs or alcohol). Also, *Nieves v. Astrue* is instructive: there the district court held that "the fact that [a treating physician] did not specifically discuss whether or how the plaintiff's mental condition would be affected in the absence of drug and alcohol use is not proper grounds for discrediting his findings." No. 06-cv-02478-REB, 2008 WL 4277995, at *4 (D. Colo. Sept.16, 2008). Also, as discussed above, Dr. Snyder considered Mr. Grant's combined impairments, including his alcoholism.

The ALJ's second reason for discounting Dr. Snyder's assessment — that she considered Mr. Grant a "poor historian" — also does not meet the "specific and legitimate" standard. When a physician's opinion is heavily based on a claimant's self-reports, rather than clinical evidence, and the ALJ finds the claimant not credible, then the ALJ may discount the physician's opinion. *See Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014). "However, when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Id.* (citing *Ryan*, 528 F.3d at 1199–1200). As discussed above, while Dr. Snyder based her conclusions in part on Mr. Grant's self-reporting, she also based it on her review of his medical and personal history, his medical records, and her administration of tests.

The ALJ's third reason for rejecting Dr. Snyder's assessment — that Mr. Grant fell asleep during cognitive testing — is not (given the circumstances of the overall assessment) a legitimate reason supported by substantial evidence in the record for disregarding Dr. Snyder's entire

diagnosis. Dr. Snyder accounted for the "falling asleep" issue twice in her summary, writing the following about her assessment about cognition: "considering he fell asleep several times during the testing, please interpret with caution."[373] And her psychological evaluation was based on (again) her own observations and included her assessment that Mr. Grant's issues were primarily medical. She administered other tests, considered other medical and personal history, reviewed medical records, and made other diagnoses beyond the diagnosis about cognition.[374]

The ALJ's fourth reason for discounting Dr. Snyder — that there are no records of mental-health treatment — also is not a specific and legitimate reason supported by substantial evidence because it is inaccurate. At the July 20, 2015 hearing, Dr. Todd mentioned Mr. Grant's visit with Ms. Madison.[375] The ALJ then asked Mr. Grant whether he "went back to [Ms. Madison] or saw some other counselor," and Mr. Grant testified that he received counseling at Lifelong Medical Center.[376] Contrary to the ALJ's assertion that "there is no evidence of any mental health treatment,"[377] Mr. Grant's testimony was accurate, as records submitted after the July 20, 2015 hearing show that he sought counseling at Lifelong Medical Center from Ms. Madison and Ms. Wachter and had home visits with other Lifelong social workers.[378] Moreover, records submitted before the July 20, 2015 hearing indicate that Mr. Grant received "psychological and emotional support" during his visits with Dr. Baldwin, including prescription medication for his "severe anxiety spells."[379] Dr. Heath also noted that Mr. Grant had an appointment with a physician concerning his anxiety and depression and that Mr. Grant would benefit from medication.[380]

---

[373] AR 801.

[374] AR 798–802.

[375] AR 66.

[376] AR 68–69.

[377] AR 35.

[378] *See, e.g.*, AR 1550–59 (counseling with Ms. Wachter), 1560–66 (home visits with social workers from Lifelong Medical Center) 1567–70 (counseling with Ms. Madison).

[379] AR 1068–69.

[380] AR 959, 971.

Lastly, treating physicians at Alta Bates Summit Medical Center diagnosed Mr. Grant with

depression and prescribed medication.[381]

Given the court's remand on other grounds, and Dr. Snyder's overall comprehensive

assessment, the ALJ can reconsider Dr. Snyder's assessment on remand.

### 1.2 Dr. Wu — Treating

Mr. Grant argues that the ALJ erred when he attributed "little weight" to Dr. Wu's RFC

assessment:

> I accord the assessment of Dr. Serena Wu little weight because it is inconsistent
> with the preponderance of the longitudinal medical evidence of record as a whole.
> There is little basis for Dr. Wu to conclude [Mr. Grant] is unable to at least sit for 6
> hours in an 8-hour workday, and that [Mr. Wu] is likely to be absent from work
> about 2 days per month. Her statement is conclusory and she did not cite specific
> findings or studies. Most tellingly, she failed to mention the likely pervasive
> adverse effects of [Mr. Grant's] substance abuse on his physical functioning. The
> foregoing leads me to conclude her statement amounts to mere advocacy rather
> than objective analysis.[382]

Without specific and legitimate reasons supported by substantial evidence, the ALJ's first

reason for rejecting Dr. Wu's assessment — that it is "inconsistent with the longitudinal medical

evidence of [the] record as a whole"— is boilerplate and insufficient. The ALJ failed to point to

any particular parts of the record that were inconsistent with Dr. Wu's assessment. *Garrison*, 759

F.3d at 1012–13. This conclusion is supported by *Sorrell v. Colvin*, No. 13-cv-04874-SI, 2015 WL

1152781, at *5 (N.D. Cal. Mar. 13, 2015). In *Sorrell,* the ALJ rejected an RFC assessment by a

treating physician, which was contradicted by a non-examining ME, on the ground that it was

inconsistent with "the objective medical evidence of record." *Id.* The court held that this reason

was insufficient because the ALJ did not explain how the treating physician's assessment

conflicted with the medical evidence in the record. *Id.* Here too, the ALJ failed to "set forth his

own interpretations and explain why they, rather than the doctors', are correct." *Reddick*, 157 F.3d

at 725 (citing *Embrey v. Bowen*, 849 F.3d 418, 421–22 (9th Cir. 1988)).

---

[381] AR 1605, 1627.

[382] AR 40.

Second, the ALJ rejected Dr. Wu's opinion concerning Mr. Grant's inability to sit for at least six hours in an eight-hour workday and the likelihood that he would be absent from work approximately two days per month on the ground that "her statement is conclusory and she did not cite specific findings or studies."[383] This also is insufficient to reject her opinion. Treating sources cannot be rejected solely because they "are not well supported by medically acceptable clinical and laboratory . . . techniques." SSR 96-2p.[384]

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.

See also Bennett v. Colvin, 202 F. Supp. 3d 1119, 1133 (N.D. Cal. 2016) (holding that a "fail[ure] to reveal the type of significant and laboratory abnormalities one would expect if the claimant were in fact disabled" did not constitute a specific and legitimate reason for rejecting a physician's opinion because the ALJ failed to "specify which clinical and laboratory abnormalities one should expect" or "any other support for this conclusion").

It is important that Dr. Wu was part of Mr. Grant's treatment team at Lifelong Medical Center. While she saw him only once before she conducted the RFC assessment, she reviewed his extensive prior treatment with Lifelong, including his visits with her colleague (and his prior primary-care physician) Dr. Heath. This is why she recorded that the first patient contact was December 26, 2012.[385] The length of the treatment relationship is relevant in that "the longer a treating source has treated [a claimant] and the more times [that claimant] has been seen by a treating source, the more weight [the Social Security Administration] will give to the source's medical opinion. 20 C.F.R. § 404.1527(c)(2)(i). Even a physician's "limited" contact with a

---

[383] Id.

[384] SSR 96-2p has since been rescinded (as of March 27, 2017) but was in effect at the time of Mr. Grant's ALJ hearing.

[385] AR 1035.

patient can be sufficient for that physician to be considered a treating source, provided that "the claimant must have seen 'the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [a claimant's] medical conditions." *Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir. 2003) (quoting 20 C.F.R. § 404.1502). Dr. Wu was in the same practice as Dr. Heath, who saw Mr. Grant many times before Dr. Wu became Mr. Grant's primary-care physician.[386] Indeed, Dr. Wu's initial assessment of Mr. Grant's medical condition recognized that Dr. Heath was Mr. Grant's physician,[387] referenced Mr. Grant's chronic medical issues,[388] and was predicated not only on her observations and tests but also on Mr. Grant's medical records reflecting medical assessments, treatment, and tests conducted by Dr. Heath, other physicians, pharmacists, and other providers.[389] Her assessment cannot be divorced from Mr. Grant's overall treatment at Lifelong, and thus she is a treating physician. *Benton*, 331 F.3d 1038–39 (explaining that "nothing forecloses" a physician from completing an RFC assessment "on behalf of [a] treatment team").

The ALJ's third reason for rejecting Dr. Wu's opinion — that she "failed to mention the likely pervasive effects of the claimant's substance abuse" — also does not constitute a specific and legitimate reason to discount Dr. Wu's RFC assessment. *See Bustamante* 262 F.3d 949, 955 (9th Cir. 2001) (holding that an ALJ must complete the five-step framework before looking to see whether a claimant would still be disabled if he or she were to cease from using drugs or alcohol); *Eckermann v. Astrue*, 817 F. Supp. 2d 1210, 1224 (D. Idaho 2011) (holding that "the ALJ's repeated reference to Petitioner's substance use as a reason for rejecting the opinions of Petitioner's treating and examining medical sources constituted legal error" because the "implementing regulations contemplate that the ALJ will make an initial disability determination

---

[386] *See, e.g.*, AR 876–84, 897–908, 912–44, 969–980, 984–92, 1224–27, 1234–42, 1247–59, 1263–66, 1269–72, 1277–79.

[387] AR 1221.

[388] *Id.*

[389] *See, e.g.*, AR 926–50 (tests ordered by Dr. Heath), 873–75, 891–93 (visits with Dr. Fueller at Lifelong Medical Center), 894–96 (medical reconciliation visit with Kristin Wong, Pharm.D., and Shadi Doroudgar, Pharm.D.).

without regard to substance abuse"); *accord Nieves*, 2008 WL 4277995 at *4 (discussed above).

Moreover, Dr. Wu listed Mr. Grant's chronic impairments, including chemical dependency and alcohol abuse.[390]

In sum, the ALJ did not have specific and legitimate reasons for discounting Dr. Wu's opinion.

### 1.3 Dr. Todd — Non-Examining

The ALJ gave the greatest weight to Dr. Todd's opinion:

> In reaching my RFC determination herein, I rely for the most part on the assessment of Dr. Todd, according his opinion great weight because it is consistent with the preponderance of the longitudinal medical evidence of record as a whole. In addition, Dr. Todd is the only physician in this case to have reviewed the entire medical evidence of record (except for Exhibit 19F submitted post-closing, which adds little substantively). [391]

The ALJ's reasons for attributing "great weight" to Dr. Todd's opinion are insufficient.

Initially, the ALJ's conclusion that Dr. Todd was only physician to review the entire record[392] is inconsistent with the submission of numerous exhibits after the July 20, 2015 hearing. At the July 20, 2015 hearing, Dr. Todd testified that he had reviewed Exhibits 1–18F,[393] and the ALJ asserted that the only remaining medical evidence Exhibit was 19F.[394] But the medical evidence consists of Exhibits 1F–23F, meaning that Dr. Todd apparently did not review five exhibits that make up over a third of the pages of medical evidence in the record.[395]

Dr. Todd misreported some exhibits that he did review, and the exhibits submitted after the hearing also are at odds with some of his findings. He testified that Mr. Grant suffered from six medical conditions: chronic pain, respiratory issues/chronic heart failure, morbid obesity,

---

[390] *See* AR 1221.

[391] AR 40.

[392] *Id.*

[393] AR 60.

[394] AR 40.

[395] The medical evidence in the record totals 1386 pages. *See* AR 414–1781. Exhibits 19F–23F total 495 pages. *See* AR 1286–1781.

United States District Court
Northern District of California

polysubstance abuse, depression, and a global left ventricular ejection fraction. His conclusions were inconsistent with the record with respect to five of them.

First, Dr. Todd testified that Mr. Grant suffered from "pain in various parts of his body, and particularly in a non-healing fracture of the right ankle, but there's no documentation by physical therapy, or whether he uses a device, or a walker, or what he does."[396] But as discussed above, Mr. Grant's treatment included physical therapy with Mr. Joson at Eden Medical Center.[397] As Mr. Grant testified,[398] Mr. Grant attended physical therapy sessions that involved treatment in a pool.[399] Moreover, in Exhibit 17F, which was available for Dr. Todd's review,[400] treating physician Dr. Baldwin indicated in February 2015 that Mr. Grant's "ankle is unstable and causes him to lose his balance and sometimes fall" and that "[h]e is required to use a cane to assist in ambulation."[401] Other medical records in the administrative record also show that at times, Mr. Grant needed to use a cane or a walker. For instance, January 2015 progress notes from Eden Medical Center reflect that Mr. Grant used a single-point cane.[402] Ms. Madison noted in July 2015 that Mr. Grant "report[ed] increased falls" when he did not use his cane.[403] Treating physician Dr. Heath reported in August 2013 that Mr. Grant had fallen recently and occasionally used a cane.[404] Lastly, as discussed above, treating physician Drs. Fakiri and Cheng reported in March 2011 that Mr. Grant used a walker during a hospital visit and that he typically wore "hardware" on his right ankle.[405]

---

[396] AR 61.

[397] *See* AR 1383–84, 1402–03, 1425–27, 1458–60, 1479–81.

[398] AR 74.

[399] AR 1402–03, 1425–27, 1458–60, 1479–81.

[400] AR 60.

[401] AR 1074.

[402] AR 1299.

[403] AR 1550.

[404] AR 891.

[405] AR 415–17.

Second, Dr. Todd testified that Mr. Grant suffered from breathing problems, including acute respiratory failure and shortness of breath, maybe congestive heart failure, and "lung disease by pulmonary function test."[406] He testified that "it would appear that he's relatively well as far as his lungs and his heart" following his recovery in June 2013.[407] As discussed above, records submitted after the hearing show that Mr. Grant also suffered from breathing issues and congestive heart failure after June 2013. For instance, he was hospitalized beginning in March in 2015 in significant respiratory distress and suffering from acute diastolic congestive heart failure.[408] He was in a state of "hypertensive emergency" and was admitted to the intensive-care unit.[409] August 2015 medical records document visits with Dr. Wu and report that Mr. Grant was suffering from congestive heart failure and shortness of breath.[410]

Third, Dr. Todd testified that Mr. Grant suffered from morbid obesity and that Mr. Grant's weight was "well into the 200s,"[411] but as discussed above, the record demonstrates that Mr. Grant weighed substantially more than that throughout the relevant time. For example, in April 2015, he weighed 384 pounds.[412] In August 2015, records submitted after the hearing show that he weighed 405 pounds.[413]

Fourth, concerning Mr. Grant's substance abuse, Dr. Todd testified that Mr. Grant's substance abuse was the cause of his falling asleep during his medical appointments:

> ME: As a medical doctor, when patients are so sleepy like this we know the problem is substance abuse, and so his sleepiness is a marker of active substance abuse, which could be just alcohol, it could be additional Oxycodone or Cocaine, so that's a problem.

---

[406] AR 61.

[407] *Id.*

[408] *See* AR 1685–1723.

[409] *See* AR 1708.

[410] *See, e.g.*, AR at 1593.

[411] AR 61.

[412] AR 1166.

[413] AR 1729.

ALJ: Of course he's claiming it's sleep apnea that causes him to be sleepy during the day.

ME: Well, yeah, but not so sleepy you can't sign permission for a doctor to treat you. I mean you don't fall asleep when you're in a doctor's room. Even though you might be tired, you're not going to fall asleep. There is a very rare condition that, you know—paroxysmal—what do they call it? Narcolepsy. He doesn't have that. It's not mentioned anywhere in the record.[414]

But in fact, Mr. Grant's treating physicians have attributed his falling asleep during the day, even during his medical appointments, to both obstructive sleep apnea and narcolepsy. For example, in February 2013, Dr. Heath noted that he had observed Mr. Grant experience two episodes of obstructive sleep apnea in while he was at Dr. Heath's office and referred Mr. Grant for a sleep study.[415] In August 2014, Dr. Heath noted a direct correlation between Mr. Grant's ability to stay awake during an appointment and his use of his CPAP machine to treat his obstructive sleep apnea: "This is the first visit I have had with this patient in which he remained awake throughout. Praised and urged to continue CPAP."[416] Additionally, while Mr. Grant was hospitalized at San Leandro Hospital in July 2013, Dr. Williams suspected that Mr. Grant was very lethargic and sleepy because his CPAP machine was leaking.[417] After Mr. Grant was placed on a hospital BiPAP machine, his "condition improved and he actually woke up."[418] These instances, contained in exhibits available for Dr. Todd's review, indicate that Mr. Grant's treating physicians believed there was a correlation between their ability to effectively treat his obstructive sleep apnea and his falling asleep frequently during the day. Moreover, in an exhibit submitted after the hearing, a physician at Eden Medical Center observed that it was "[d]ifficult [for Mr. Grant] to remain awake due to sleep apnea."[419] Finally, despite also having this portion of the record available for his review, Dr. Todd asserted that there was no evidence in the record that Mr.

---

[414] AR 67.

[415] AR 992.

[416] AR 1266.

[417] AR 1014.

[418] *Id.*

[419] AR 1292.

Grant had narcolepsy.[420] But treating physician Dr. Baldwin diagnosed Mr. Grant with "severe narcolepsy."[421]

Fifth, Dr. Todd testified that Mr. Grant "has a depression problem," and Mr. Grant was "not on any antidepression medications."[422] He further testified that, while Mr. Grant had seen Ms. Madison once, he was unsure if he ever saw her or obtained other treatment following that one visit.[423] As discussed above, and as Mr. Grant testified, records submitted after the hearing show that Mr. Grant saw social workers at Lifelong Medical Center for his polysubstance abuse, depression, and anxiety.[424] Moreover, as shown in an exhibits available for Dr. Todd's review, Dr. Baldwin provided Mr. Grant with "psychological/emotional support" and prescribed medication "for severe anxiety spells."[425] Dr. Heath also noted that Mr. Grant had an appointment with a physician concerning his anxiety and depression and that Mr. Grant would benefit from medication.[426] Lastly, exhibits submitted after the hearing indicate that treating physicians at Alta Bates Summit Medical Center diagnosed Mr. Grant with depression and prescribed medication.[427]

In sum, the ALJ's reasons for attributing great weight to Dr. Todd's opinions are insufficient.

### 1.4    Dr. Saphir and Dr. Mansour — Non-Examining

The ALJ gave less weight to the medical opinions of Drs. Saphir, Mansour, and Giorgi "to the extent they are inconsistent with the assessment of Dr. Todd."[428] Mr. Grant argues that the ALJ committed legal error by giving any — even partial — weight to the opinions of Drs. Saphir and Mansour because they gave "great weight" to the opinion of Dr. Frank Chen.[429] The Court agrees.

---

[420] AR 67.

[421] AR 1067, 1070.

[422] AR 62.

[423] AR 66–68.

[424] *See, e.g.*, AR 1550–59 (counseling with Ms. Wachter), 1567–70 (counseling with Ms. Madison).

[425] AR 1068, 1071.

[426] AR 959, 971.

[427] AR 1605, 1627.

[428] AR 40.

[429] Mot. – ECF No. 18 at 13–14.

Dr. Chen evaluated Mr. Grant, and was subsequently removed from the Disability Determination Services (DDS) panel for his "unprofessional manner and failure to adequately correct deficiencies in his CE reports."[430] The ALJ assigned gave no weight to Dr. Chen's opinion.[431] The question remains, however, whether the examinations by Drs. Saphir and Mansour are so tainted by their reliance on Dr. Chen's findings that they ALJ should not have given them any weight. In *Kernan v. Berryhill*, another judge in this district addressed a similar set of facts. No. 16-cv-02923-JSC, 2017 WL 3232517, at *9 (N.D. Cal. July 31, 2017). In *Kernan*, the ALJ gave no weight to Dr. Chen's assessment but nonetheless relied on another non-examining assessment that had, in turn, relied on Dr. Chen's findings. *Id.* The *Kernan* judge held that the "ALJ erred in according 'great weight'" to the non-examining physician who had relied on Dr. Chen's findings. *Id.* at *8. Because "the ALJ placed 'great weight' on [the non-examining doctor's] opinion, [and because that non-examining doctor] relied on Dr. Chen's discredited opinion, substantial evidence does not support the ALJ's determination that Plaintiff could perform medium work. Thus, remand is required for further development of the record regarding Plaintiff's residual functional capacity." *Id.* Here, like the ALJ in *Kernan*, the ALJ attributed no weight to Dr. Chen's assessment. And like the ALJ in *Kernan*, the ALJ relied on the findings of other non-examining physicians who relied on Dr. Chen's assessment.

The court concludes that the ALJ erred by relying on the findings of Drs. Saphir and Mansour because, "[a]s [Dr. Saphir and Dr. Mansour] did not examine [Mr. Grant], it is unclear what parts of [Dr. Saphir and Dr. Mansour's] assessment[s] are based on Dr. Chen's previous analysis and what is based on [their] review of other records." *Id.* at *8.

### 1.5   Dr. Baldwin — Treating

The ALJ erred by failing to address Dr. Baldwin's findings. The Ninth Circuit has emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

---

[430] AR 40 n. 1 (quoting third and final "Corrective Action" letter).

[431] *Id.*

United States District Court
Northern District of California

> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it very little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

*Garrison*, 759 F.3d at 1012–13. The ALJ's crediting of non-examining medical expert Dr. Todd's opinion (which contradicted treating physician Dr. Baldwin's findings) is error because the ALJ did not provide specific and legitimate reasons supported by substantial evidence to reject Dr. Baldwin's opinion. *Id.*; *see also Marsh v. Colvin*, 792 F.3d 1170, 1172–73 (9th Cir. 2015) ("Because a court must give 'specific and legitimate reasons' for rejecting a treating doctor's opinions, it follows even more strongly that an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them."). The ALJ did not address Dr. Baldwin's treatment notes, and instead only cited them as an exhibit number in a string cite with many other exhibits as evidence of Mr. Grant's chronic conditions.[432] Under the circumstances — including the ALJ's failure to mention Dr. Baldwin by name and the fact errors discussed in this order — the court concludes that the ALJ did not provide specific and legitimate reasons for ignoring Dr. Baldwin's findings and crediting instead Dr. Todd.

\* \* \*

For the reasons discussed above, the court remands so that the ALJ may consider the medical-opinion evidence in this case.

### 2. Whether the ALJ Erred at Step Two by Failing to Evaluate Mr. Grant's Depression, Edema, and Congestive Heart Failure

Mr. Grant argues that the ALJ erred by not finding that depression, bilateral edema, restrictive lung disease, and congestive heart failure are severe impairments.[433] The court finds that the ALJ

---

[432] AR 37.

[433] Mot. – ECF No. 18 at 14–18.

erred at step two for failing to list Mr. Grant's depression, congestive heart failure, and restrictive lung disease as "severe" impairments.

At step two of the five-step sequential inquiry, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). The ALJ must consider the record as a whole, including evidence that both supports and detracts from its final decision. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). An impairment is not severe if it does not significantly limit the claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1521(a).[434] Basic work activities are "abilities and aptitudes necessary to do most jobs," including, for example, "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1521(b). To determine the severity of a mental impairment specifically, the ALJ must consider four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a.

"[T]he step two inquiry is a *de minimis* screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (citing *Bowen v. Yuckert*, 482 U.S. 137 at 153–54 (1987)). Thus, "[a]n impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual['s] ability to work." *Id*. (internal quotation marks omitted) (citing SSR 85–28; *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir.1988)).

Concerning the ALJ's failure to list bilateral edema at step two, any error is harmless because the ALJ discussed Mr. Grant's bilateral edema later in the decision,[435] curing any error. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding that even if the ALJ erred at step two for failure to list a medical condition, the error was harmless because the ALJ discussed the medical condition later in the five-step framework).

---

[434] The Social Security Administration promulgated new regulations, including a new § 404.1521, effective March 27, 2017. The previous version, effective to March 26, 2017, governs based on the date of the ALJ's hearing, May 29, 2015.

[435] AR 39.

The ALJ erred, however, when he found that Mr. Grant's depression did not constitute a "severe" impairment. Concerning Mr. Grant's depression, the ALJ improperly rejected the opinion of Dr. Snyder and also found that there was "no evidence of any mental health treatment."[436] As discussed above, and as Mr. Grant testified, he saw social workers at Lifelong Medical Center for his polysubstance abuse, depression and anxiety.[437] Dr. Heath also noted that Mr. Grant had an appointment with a physician concerning his anxiety and depression and that Mr. Grant would benefit from medication.[438] Moreover, the record shows that treating physicians at Alta Bates Summit Medical Center diagnosed Mr. Grant with depression and prescribed medication.[439] The analysis at step two is built on the ALJ's weighing of the medical evidence. Here, the record as a whole shows that Mr. Grant's mental health conditions were more than a "slight abnormality." *See Smolen*, 80 F.3d at 1290.

The ALJ also erred by failing to list restrictive lung disease and congestive heart failure as "severe" impairments. While the ALJ did discuss some of Mr. Grant's cardiac and pulmonary conditions later in the five-step framework, he did not address congestive heart failure or restrictive lung disease. Physicians diagnosed Mr. Grant with restrictive lung disease on multiple occasions when Mr. Grant was in the hospital and having difficulty breathing,[440] and congestive heart failure is one of Mr. Grant's most persistent chronic health problems in the record.[441] Accordingly, these conditions are more than a "slight abnormality" and be considered at step two. *See Smolen*, 80 F.3d at 1290.

\* \* \*

---

[436] AR 35.

[437] *See, e.g.*, AR 1550–59 (counseling with Ms. Wachter), 1567–70 (counseling with Ms. Madison).

[438] AR 959, 971.

[439] AR 1605, 1627.

[440] *See, e.g.*, AR 769, 1013–14.

[441] *See, e.g.*, AR 415, 582, 786, 992, 1067, 1070, 1167, 1175–76, 1184, 1192, 1199, 1216, 1579, 1586, 1593.

For the reasons discussed above, the ALJ erred at step two. On remand, the ALJ can consider the significance of Mr. Grant's depression, restrictive lung disease, and congestive heart failure.

### 3. Whether the ALJ Adequately Considered Listings of Impairments at Step Three

Mr. Grant contends that the ALJ erred at step three by not considering whether his impairments met the severity requirements of Listings 4.11 and 12.04.[442] The court agrees.

At step three of the five-step framework, "[i]f a claimant has an impairment or combination of impairments that meets or equals a condition outlined in the "Listing of Impairments," then the claimant is presumed disabled." *Lewis*, 236 F.3d at 512 (citing 20 C.F.R. § 404.1520(d)). "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." *Id.* (citing *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990)). "Medical equivalence will be found 'if the medical findings are at least equal in severity and duration to the listed findings.'" *Marcia*, 900 F.2d at 175–76 (quoting 20 C.F.R. § 404.1526). Accordingly, at step three, "the ALJ must explain adequately his evaluation of the alternative tests and the combined effects of the impairments" to determine whether a claimant equals a Listing. *Id.* at 176.

Listing 4.11 states:

> Chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system and one of the following:
>
> A. Extensive brawny edema (see 4.00 G3) involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip.
>
> OR
>
> B. Superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment.

---

[442] Mot. – ECF No. 18 at 21–22.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 4.11. "Brawny edema," as outlined in Listing 4.00G3, is:

> characterized as "swelling that is usually dense and feels firm due to the presence of increased connective tissue; it is also associated with characteristic skin pigmentation changes. It is not the same thing as pitting edema. Brawny edema generally does not pit (indent on pressure), and the terms are not interchangeable. Pitting edema does not satisfy the requirements of 4.11A.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 4.00G3. As discussed above, physicians have characterized Mr. Grant's edema as "pitting edema,"[443] which does not satisfy the requirements of Listing 4.11. But practitioners diagnosed Mr. Grant with lymphedema.[444] While lymphedema "does not meet the requirements of [Listing] 4.11, . . . it may medically equal the severity of that listing." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 4.00G4. Given that the ALJ found that Mr. Grant suffered from lymphedema at step two of the five-step framework and that lymphedema may equal the requirements of Listing 4.11, the court finds that remand is appropriate. The ALJ should have addressed whether Mr. Grant's lymphedema was sufficiently severe to equal the requirements of Listing 4.11 and "explained adequately his evaluation of the alternative tests and the combined effects of the impairments" to determine whether Mr. Grant's impairments equal the requirements of the Listing. *Marcia*, 900 F.2d at 176.

The "paragraph B" criteria of Listing 12.04 requires that Mr. Grant satisfy least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence , or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04. As discussed above, Dr. Snyder found that Mr. Grant suffered from only mild to moderate impairments.[445] Fully crediting her testimony alone would be insufficient to warrant a remand. Given the other instances in the record where physicians

---

[443] *See, e.g.*, AR 1176–78.

[444] *See, e.g.*, AR 1176, 1188, 1300, 1308–09, 1392–94, 1583–85, 1641.

[445] AR 802.

diagnosed Mr. Grant with depression and prescribed him medication after Dr. Snyder's evaluation,[446] however, the court concludes that further administrative review is needed to determine whether the ALJ's failure to consider Listing 12.04 was, in fact, harmless. *See Molina*, 674 F.3d at 1115 (explaining that the Ninth Circuit applies "harmless error principles" by "look[ing] at the record as a whole to determine whether the error alters the outcome of the case").

*      *      *

For the reasons discussed above, the court concludes that the ALJ erred at step three. On remand, the ALJ can consider whether Mr. Grant's impairments meet or equal Listings 4.11 and 12.04.

### 4. Whether the ALJ Erred by Finding Mr. Grant's Reports of His Own Symptoms Not Credible

Mr. Grant contends that the ALJ erroneously discredited his testimony. In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted). "At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek

---

[446] *See, e.g.*, 1605, 1627.

treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal quotation marks omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citing *Lester*, 81 F.3d at 834) ; *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

The ALJ found the following about Mr. Grant's testimony:

> Finally, I find [Mr. Grant's] allegation of complete debilitation not generally credible. As previously noted, Dr. Todd stated [Mr. Grant's] physical functioning would be greatly enhanced if he were to cease substance abuse. In addition, there is extensive evidence of non-compliance with medications and diet in the record. [Mr. Grant], who admitted to being an alcoholic, continues to drink around 1–2 pints of vodka daily, and even works at a liquor store. Also, he was noted to be a poor historian, and his claims of abstinence from cocaine and reducing drinking conflict with most of the record.[447]

The ALJ satisfied the first step of the two-step inquiry when he determined that Mr. Grant's medically determinable impairments "could reasonably be expected to cause some of the symptoms alleged."[448] *See Molina*, 674 F.3d at 1112. But the ALJ did not provide any evidence or find that Mr. Grant was a malingerer. Accordingly, he needed to provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of Mr. Grant's symptoms. *Id.* (internal quotation marks and citations omitted). Because the ALJ discredited Mr. Grant's testimony in part on his assessment of the medical-opinion evidence, including Dr. Todd's testimony, the court remands on this ground too. The ALJ can reassess Mr. Grant's credibility in context of the entire record.

---

[447] AR 40.

[448] AR 37.

### 5. Whether the ALJ's Determination of Mr. Grant's RFC Was Supported by Substantial Evidence

Mr. Grant contends that the ALJ did not properly consider the whole of the medical record and thereby arrived at an erroneous RFC that is not supported by substantial evidence.[449] "[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r of Social Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015); see also *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) ("it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity"). The ALJ's determination of a claimant's RFC must be based on the medical opinions and the totality of the record. 20 C.F.R. §§ 404.1527(d), 404.1546(c). Moreover, the ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison*, 759 F.3d at 1010 (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn*, 495 F.3d at 630 ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

The ALJ relied in part on his findings at prior steps within the five-step framework. Because the court found errors in these findings, and because the ALJ's RFC was predicated on these findings, the court remands on this basis too.

### 6. Whether the ALJ Erred at Step Five by Relying on an Erroneous RFC

Because the court remands on issues such as the ALJ's weighing and evaluation of the medical records and Mr. Grant's testimony (predicates for the RFC determination and application of the Medical-Vocational Guidelines), the court remands this issue too for reconsideration based on the full record.

---

[449] Mot. – ECF No. 18 at 16–17.

## 7. Whether the Court Should Remand for Further Proceedings or Immediately Award Benefits

The court has "discretion to remand a case either for additional evidence and findings or for an award of benefits." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen*, 80 F.3d at 1292); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) ("The decision whether to remand for further proceedings or simply to award benefits is within the discretion of [the] court.") (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)). Generally, "'[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.'" *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)) (alteration in original); *see also Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits."); *McCartey*, 298 F.3d at 1076 (remand for award of benefits is discretionary); *McAllister*, 888 F.2d at 603 (remand for award of benefits is discretionary); *Connett*, 340 F.3d at 876 (finding that a reviewing court has "some flexibility" in deciding whether to remand).

For the reasons described above, the court finds that remand is appropriate so as to "remedy defects in the original administrative proceeding." *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d at 635 (alteration in original)).

## CONCLUSION

The court grants Mr. Grant's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands this case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: September 24, 2018

_____
LAUREL BEELER
United States Magistrate Judge